In the

# United States Court of Appeals
## For the Seventh Circuit

––––––––––––––

Nos. 14-3728 & 15-1793

BRIDGEVIEW HEALTH CARE CENTER, LTD., an Illinois corpora-
tion, individually and as the representative of a class of
similarly-situated persons,

*Plaintiff-Appellant*,

*v.*

JERRY CLARK, d/b/a Affordable Digital Hearing

*Defendant-Appellee*.

––––––––––––––

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 09-cv-05601 — **Maria G. Valdez**, *Magistrate Judge*.

––––––––––––––

ARGUED NOVEMBER 5, 2015 — DECIDED MARCH 21, 2016

––––––––––––––

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

MANION, *Circuit Judge*. This appeal arises out of unsolic-
ited fax ads that were blasted across multiple states in viola-
tion of the Telephone Consumer Protection Act (TCPA). While
the parties agree that the TCPA was violated, they dispute
who was responsible for sending the fax ads: Jerry Clark,
whose Affordable Digital Hearing company was advertised

in the faxes, or the Business to Business Solutions (B2B) marketing company that actually sent the faxes. After Bridgeview Health Care Center received an Affordable Hearing ad in the Chicago area, Bridgeview brought this class-action lawsuit against Clark.

When the district court granted partial summary judgment in the plaintiffs' favor, Clark was held liable for violating the TCPA by authorizing fax ads to plaintiffs within 20 miles of Affordable Hearing. The district court also conducted a bench trial on Clark's liability to plaintiffs more than 20 miles from Affordable Hearing, however, and concluded that Clark was not liable to them. These cross-appeals ask how far his liability extends. We affirm.

## I. Background

Jerry Clark runs Affordable Digital Hearing, a small company in Terre Haute, Indiana. In June 2006, Clark received calls from B2B employee Conor Melville.[1] Melville told Clark that B2B could market Affordable Hearing's services by faxing advertisements to potential business customers. Although Clark said that he was not interested, Melville placed a follow-up call, assuring Clark that many local businesses were using fax advertisements. As a result, Clark agreed to give the fax-advertising program a try. Clark edited and approved the language of the ad.

Clark verbally instructed B2B to send about 100 faxes to local businesses within a 20-mile radius of Terre Haute. He did not know what it cost to send a fax, but thought the

---

[1] We use Melville's real name, but he told Clark that his name was Kevin Wilson.

quoted $279 was a reasonable charge for this quantity of advertisements. Because he trusted that Melville would send the 100 faxes as authorized, Clark never asked to see the list of fax numbers that B2B was using. Clark did not realize that B2B actually faxed 4,849 ad flyers to businesses across Indiana, Illinois, and Ohio. According to B2B's records, it faxed Clark a letter stating that it would send 6,000 ads on his behalf, but the record shows that Clark neither received nor saw this letter.

After Bridgeview received a fax ad at its location outside Chicago, it sued under the TCPA, which, unbeknownst to Clark, outlaws unsolicited fax ads. This litigation was overseen in district court by Magistrate Judge Maria Valdez, who certified all fax recipients as a class. In granting summary judgment for class members located within 20 miles of Terre Haute, she gave the statutory penalty of $500 per recipient to 32 recipients within that 20-mile radius. This resulted in a $16,000 judgment against Clark. Judge Valdez then conducted a bench trial on Clark's liability to recipients, including Bridgeview, who were more than 20 miles away. This bench trial resulted in a judgment that Clark is not liable for the junk faxes sent more than 20 miles from Terre Haute.

Bridgeview now challenges the trial outcome, along with one of Judge Valdez's evidentiary rulings at trial. Clark cross-appeals her rulings on class certification.

## II. Discussion

These appeals raise four issues: Bridgeview appeals two of the district court's rulings and Clark appeals two. We begin with the arguments made by appellant Bridgeview.

### A.  Agency Liability: Faxes Sent Outside the 20 Miles

Bridgeview first appeals the outcome of the bench trial, where Judge Valdez found Clark not liable for the fax ads sent more than 20 miles outside Terre Haute. Because there was a bench trial, we review the court's legal conclusions de novo and review factual findings for clear error. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1044 (7th Cir. 2002).

The TCPA makes it illegal to send an unsolicited fax advertisement unless (1) the sender and recipient have an established business relationship, (2) the recipient voluntarily made its fax number available through specified means, or (3) the fax ad contained a statutorily compliant notice. 47 U.S.C. § 227(b)(1)(C). When Affordable Hearing's faxes went out, its advertisements were in violation of the TCPA.

The fax sender is defined in federal regulations as either the person "on whose behalf" the unsolicited ad is sent or the person whose services are promoted in the ad. 47 C.F.R. § 4.1200(f)(10). When a third party acted on the sender's behalf, district courts in this circuit previously analyzed the sender's liability under a combination of agency and direct-liability theories. *See Bridgeview Health Care Ctr. v. Clark*, 2015 WL 1598115, at *4 (N.D. Ill. Apr. 8, 2015) (collecting citations). In 2013, a Federal Communications Commission ruling known as *Dish Network*, 28 F.C.C.R. 6574 (2013), stated that sellers may be liable for third-party telemarketing calls made on the sellers' behalf. This led district courts, including the court below in this case, to find the same in the junk-fax context. *Bridgeview*, 2015 WL 1598115, at *4 (collecting citations). Yet in response to a query from the Eleventh Circuit, the FCC has clarified that *Dish Network* is inapplicable to junk faxes. *Id.* at *5; *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris*,

*D.D.S., P.A.*, 781 F.3d 1245, 1255 (11th Cir. 2015) (vacating the Eleventh Circuit's original opinion on this matter and superseding the earlier case). While the FCC letter does not bind this court, we recognize that *Dish Network* addressed third-party telemarketing calls, and that federal regulations define sellers in the telemarketing-call context differently than in the junk-fax context. *Compare* 47 C.F.R. § 64.1200(f)(11) *with* 47 C.F.R. § 64.1200(f)(10). We therefore hold that *Dish Network* is inapplicable to junk-fax cases like this one.

In determining what theory should govern Clark's liability, the trial court correctly rejected strict liability by recognizing that it would lead to "absurd results." *Id.* at *7. The court observed that "[t]he very notion of advertising one's goods entails that one must do something to advertise them." *Id.* The question in this particular case is thus whether the Affordable Hearing ads were faxed "on Defendant's behalf." *Id.* at *8. While the district court appeared hesitant to label this an agency theory, likely because of uncertainty created by *Dish Network*, the court effectively affirmed its previous agency finding: it wrote that Clark did not "direct" B2B to send faxes beyond the 20-mile radius and that there is "no sense in which the faxes sent beyond Terre Haute were sent on [Clark's] behalf." *Id.* We recognize this for what it is: an agency analysis.

In applying the regulatory definition of a fax sender, we hold that agency rules are properly applied to determine whether an action is done "on behalf" of a principal. *See* 47 C.F.R. § 64.1200(f)(10). There are three types of agency: (1) express actual authority, (2) implied actual authority, (3) apparent authority. *See Moriarty v. Glueckert Funeral Home, Ltd.*, 155 F.3d 859, 866 (7th Cir. 1998). If Clark was acting as the principal to B2B's agent, he would have made B2B his agent in one

of these three ways, but it is clear that that none of them applies here.[2]

First, Clark did not confer express actual authority on B2B. *See id.* For this type of agency to exist, Clark must have directly spoken or written to B2B, telling it to send nearly 5,000 fax ads across multiple states. The record establishes that Clark told B2B it should send 100 faxes within 20 miles of Terre Haute. Instead, B2B sent 4,849 faxes across three Midwestern states. Because B2B expressly contradicted Clark's actual instructions, this is clearly not express actual agency.

Second, there was no implied actual authority. Implied authority is inherently contained in the agent's position. *Id.* While express actual authority is proven through words, implied actual authority is established through circumstantial evidence. *Id.* Nothing about fax marketing inherently calls for sending thousands of advertisements. And nothing about fax marketing inherently demands sending these ads to states

---

[2] We also note the potential pleading problem in Bridgeview's complaint. The plaintiff's agency claim ordinarily must appear on the face of the complaint: it is fundamental that a plaintiff "must plead and prove in order to win." *See Ashcroft v. Iqbal*, 556 U.S. 662, 673 (2009). It appears that Bridgeview's complaint fails to plead agency liability at all, whether by mentioning B2B or even hinting that Clark might be responsible for another party's actions. *See* Dkt. 1-2 at 2–14. In closely similar litigation, brought against another business that was exposed to TCPA liability through B2B fax blasting, a federal court found that this same pleading flaw was fatal to the plaintiff's ability to claim an agency relationship. *The Siding & Insulation Co. v. Alco Vending, Inc.*, 2015 WL 1858935, at *7 (N.D. Ohio Apr. 22, 2015). But here, we decline to decide whether Bridgeview's complaint failed to present an agency claim, because conducting an agency analysis demonstrates that Bridgeview's agency claim fails even if it was properly pleaded.

where the advertiser does not do business. We thus find it impossible to conclude that implied actual authority exists here.

This leaves only apparent authority. To create apparent authority, the principal must speak, write, or otherwise act toward a third party. *Id.* His conduct must make the third party reasonably believe that he has consented to an action done on his behalf by someone purporting to act for him. *Id.* In this case, the plaintiffs would be in the position of the third party, if apparent authority existed. But this, too, is more than Bridgeview can prove on this record. Clark did nothing to create an appearance that B2B had authority to send faxes on behalf of either Affordable Hearing or Clark himself. In fact, the fax-ad copy was the only way Clark could have communicated with the recipients, because their identities were unknown to him. And the ad did not even reference B2B. In short, B2B made an independent decision to blast faxes across multiple state lines.

On this record, the trial court did not err in concluding that Clark was not liable for faxes sent outside the 20-mile radius on which he expressly instructed B2B. We therefore affirm the district court's ruling at trial, which found in Clark's favor regarding faxes sent more than 20 miles from Terre Haute.

### B.  Impeachment: Prior Inconsistent Statement

Bridgeview urges that one of Clark's interrogatory answers was inconsistent with his trial testimony and that, by denying Bridgeview's impeachment attempt, Judge Valdez committed reversible error. We review the trial court's evidentiary rulings for abuse of discretion. *Wilson v. City of Chicago*, 758 F.3d 875, 881–82 (7th Cir. 2014). Reversal is only permitted

if no reasonable person would agree with the ruling and if any error likely affected the outcome of trial. *Id.* at 882.

When impeaching a witness with his own prior inconsistent statement, the examiner introduces a pretrial statement made by the witness to show that it is inconsistent with what the witness said at trial. 1 McCormick on Evid. § 34 (7th ed.). The earlier statement need not be true. Instead, "talking one way on the stand and another way previously is blowing hot and cold, raising a doubt as to the truthfulness of both statements." *Id.* We therefore examine Clark's statements for their consistency.

This is the interrogatory question on which Bridgeview relies: "If the defendant instructed any person to construct, develop, purchase, or otherwise use a list of persons and/or telephone numbers to send any facsimile transmission ... describe in detail all directions and/or instructions ... " In his interrogatory answer, Clark wrote, "Not Applicable." Clark gave no "directions and/or instructions" to construct a list of people and phone numbers, so "Not Applicable" was a reasonable response. At trial, Clark testified that he instructed B2B to send only 100 faxes within 20 miles of Terre Haute. Though Bridgeview claims these statements conflict, the interrogatory specifically requested any instructions on which individuals should receive Clark's ads ("a list of persons and/or telephone numbers"), while Clark's trial testimony was on the scope of the ad blast (100 recipients within 20 miles). There is no inconsistency on which to impeach Clark. Because the trial judge did not abuse her discretion, we decline to reverse.

### C. Class Certification: The Subclass

Clark urges that plaintiffs within 20 miles of Terre Haute should have been classified as a separate subclass. Because district courts have "broad leeway" in certification decisions, we review for abuse of discretion. *Amchem Prods. v. Windsor*, 521 U.S. 591, 630 (1997).

Under Federal Rule of Civil Procedure 23(c)(5), a class may be divided into subclasses "[w]hen appropriate." The purpose of subdivision is to protect divergent interests. Fed. R. Civ. P. 23(c)(4) advisory committee's notes to 1966 and 2003 amendments. There is no mandate to automatically subdivide classes. Instead, the key is whether the class representative adequately represents class members' interests. *In re Brand Name Prescription Drugs Antitrust Litig.*, 115 F.3d 456, 457–58 (7th Cir. 1997). If not, subclass members may seek a new representative or other appropriate changes. *Id.*

Clark argued that the district court should have created a subclass of plaintiffs within 20 miles of Terre Haute, as distinct from class members more than 20 miles away. He urges that, because Bridgeview was outside the 20-mile radius he authorized, it could not adequately represent the plaintiffs within 20 miles. As Clark admits, however, only 24 businesses received the 32 faxes sent within 20 miles. (B2B sent some ads to duplicate fax numbers.) Thus, the vast majority of recipients were outside that 20-mile radius, which contradicts Clark's argument that Bridgeview might be overly distracted by advocating arguments unique to Bridgeview. Instead, Bridgeview was in the same position as the vast majority of fax recipients.

Further, every class member had the same interest: to obtain the $500-per-recipient penalty for faxes violating the TCPA. Certainly, Bridgeview (along with all the other plaintiffs more than 20 miles outside Terre Haute) was unable to prove agency. For plaintiffs within 20 miles, agency was established at summary judgment, and they won. For plaintiffs outside 20 miles, a trial was required, and they lost. The fact that Bridgeview faced an added hurdle in its claim, however, did not prevent the district court from finding that Bridgeview could adequately represent plaintiffs within 20 miles of Terre Haute.

We therefore conclude that the district court did not abuse its discretion in certifying one class.

### D. Decertification: Reversing the $16,000 Judgment

Finally, Clark contends that the district court erred in declining to decertify the class, limit liability to plaintiffs within 20 miles of Terre Haute, and vacate the money judgment. He bases these requests on the fact that he is not liable to Bridgeview. Once again, we review the district court order for abuse of discretion. *Amchem Prods.*, 521 U.S. at 630.

We recognize that lumping all plaintiffs into one class creates outcomes that don't seem to add up: the named plaintiff has lost, while some class members (who didn't try to sue in the first place) win a judgment that the named plaintiff cannot collect. Clark owes a $16,000 class-action award even though he is not liable to the class representative. And while Bridgeview cannot collect anything, Bridgeview's counsel will be paid from the award going to recipients within 20 miles of Terre Haute. For a small business that was just experimenting with a different marketing approach, and had no

idea it was breaking the law, this is a strange and even unfair result. It could have been worse, however, and the law allows this split-level result.

We have previously written that, "[i]n this age of email and other Internet communication systems, faxes are used by businesses for little else besides advertising." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 725 (7th Cir. 2011). Fax paper and ink were once expensive, and this may be why Congress enacted the TCPA, but they are not costly today. *See id.* at 726. As a result, what motivates TCPA suits is not simply the fact that an unrequested ad arrived on a fax machine. Instead, there is evidence that the pervasive nature of junk-fax litigation is best explained this way: it "has blossomed into a national cash cow for plaintiff's attorneys specializing in TCPA disputes." Yuri R. Linetsky, *Protection of "Innocent Lawbreakers": Striking the Right Balance in the Private Enforcement of the Anti "Junk Fax" Provisions of the Telephone Consumer Protection Act*, 90 Neb. L. Rev. 70, 97 (2011). We doubt that Congress intended the TCPA, which it crafted as a consumer-protection law, to become the means of targeting small businesses. Yet in practice, the TCPA is nailing the little guy, while plaintiffs' attorneys take a big cut. Plaintiffs' counsel in this case admitted, at oral argument, that they obtained B2B's hard drive and used information on it to find plaintiffs. They currently have about 100 TCPA suits pending. Congress likely should have targeted the marketing firms, rather than their unsuspecting clients. Nevertheless, we enforce the law as Congress enacted it. We thus review whether the class should be decertified, as Clark urges here.

In declining to decertify, the district court wrote that decertification would not ultimately affect Clark's liability. Its order relied on a footnote in *East Texas Motor Freight Systems v. Rodriguez*, a Supreme Court case. *East Texas* states that "claims of the class members would not need to be mooted or destroyed because subsequent events or the proof at trial had undermined the named plaintiffs' individual claims." *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 406 n.12 (1977). In *Walters v. Edgar*, this court expressed caution about the *East Texas* "dictum." *Walters v. Edgar*, 163 F.3d 430, 433 (7th Cir. 1998). *Walters* is distinguishable from this case, however, because the named plaintiffs in *Walters* lacked standing. *Id.* Bridgeview had standing to sue. And here, because "the proof at trial had undermined" Bridgeview's claims, the Supreme Court's language directly applies. *See E. Tex.*, 431 U.S. at 406 n.12. Decertification would not affect Clark's liability to any plaintiff, while the judgment is already limited to class members within 20 miles of Terre Haute. We thus conclude that the district court did not abuse its discretion in declining to decertify the class.

### III. Conclusion

The district court's rulings are hereby AFFIRMED.