In the

# United States Court of Appeals

## For the Seventh Circuit

No. 15-1267

PALDO SIGN AND DISPLAY COMPANY,

*Plaintiff-Appellant,*

*v.*

WAGENER EQUITIES, INCORPORATED
and DANIEL WAGENER,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:09-cv-07299 — **John J. Tharp, Jr.**, *Judge.*

ARGUED MARCH 30, 2016 — DECIDED JUNE 16, 2016

Before WOOD, *Chief Judge*, and POSNER and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* Paldo Sign and Display Company ("Paldo Sign") filed suit under the Telephone Consumer Protection Act (the "Act"), 47 U.S.C. § 227(b)(1)(C), against Wagener Equities, Inc. and Daniel Wagener, seeking statutory damages after Paldo Sign received an unsolicited facsimile

advertisement promoting Wagener Equities' services. After the district court certified a class of more than ten thousand plaintiffs who had received the offending ad, a jury returned a special verdict finding that Wagener Equities had not "authorize[d] the fax broadcast transmission," and that Daniel Wagener did not "have direct, personal participation in the authorization of the fax broadcast transmission." On the basis of those findings, the court entered judgment in favor of the defendants. Paldo Sign appeals, claiming error in the jury instructions and also in an evidentiary ruling. We affirm.

## I.

In late 2006, Daniel Wagener received a telephone call from a man who identified himself as a representative of Marketing Research Center, a provider of advertising services. The man offered to create and send drafts of advertisements for Wagener Equities. Wagener agreed to accept and review any proposed ads. Wagener then received a four page fax from Marketing Research, consisting of a cover page, a pricing chart, and two sample fax advertisements for Wagener Equities. The cover page stated that Marketing Research would not send out any ads unless Wagener returned an advertisement to Marketing Research with the words "ad ok" and a client number written on the approved ad. After Wagener received the proposal, a man who identified himself as Kevin Wilson from Marketing Research called. Wagener told Wilson that he did not like either of the sample ads.

Wilson then agreed to provide Wagener with a contact list of potential recipients of the ad, as well as a new ad based on a rough draft mailer that Wagener provided. Wilson instructed

Wagener to fax a copy of a check written to Marketing Research as a show of good faith, and Wilson would then send the draft contact list. Wagener wished to review it to verify that the potential recipients were businesses that would be interested in the type of services Wagener Equities provides, and that they were located in the relevant geographical region. Wagener also wanted to review the final ad before any faxes were sent to ensure the quality. After faxing a copy of a check as instructed, Wagener did not receive a draft contact list or a final ad for his approval. And although Wagener never sent Marketing Research an approved ad with the words "ad ok" and a client number, he was surprised to find that a fax advertisement had been transmitted to thousands of recipients without his approval. The ad consisted of the rough draft mailer that he had provided to Wilson as well as ads for "Business-to-Business Solutions" or "B2B," another name under which Marketing Research operated. Wagener immediately tried to contact Wilson but could not reach him and received no response from him. When Wagener then learned that an employee of Wagener Equities had mistakenly mailed the check to Marketing Research, he instructed the employee to issue a stop order for the check. Wagener's bank successfully implemented the stop order and Wagener never heard from Marketing Research again.

But the damage had been done. The ad had been faxed to more than ten thousand recipients, including Paldo Sign, the plaintiff here. Marketing Research, which sometimes went by the name B2B, was not a company at all, but was actually a one-woman operation run by Caroline Abraham out of her home with the technical assistance of a Romanian company

named Macaw.[1] Kevin Wilson was an alias for Conor Melville, the nephew of Abraham's husband, and Wilson was an independent contractor for Macaw. Another sales representative known to Wagener as "Steve Brennan" was Terence Melville, who worked for Macaw as well. Business-to-Business Solutions, also known as B2B, was an alias originally created by Abraham to accept funds paid to Macaw in the United States. She eventually began to use the name for her fax advertising business, which grew out of her relationship with Macaw. Macaw had been sending fax advertisements from Romania, but with Abraham's assistance, they were able to facilitate fax advertising services out of her Brooklyn home.

Sending unsolicited fax advertisements is generally prohibited by the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)(C), which subjects the sender to a statutory penalty of $500 per violation. With more than ten thousand recipients of the unsolicited fax, Wagener was thus exposed to potential damages exceeding five million dollars. The Act provides, in relevant part, that it is unlawful for any person to send an unsolicited fax advertisement unless (1) the sender of the unsolicited ad has an established business relationship with the recipient; (2) the recipient voluntarily made its fax number available to the sender through statutorily specified means; and (3) the unsolicited advertisement contains a statutorily-compliant notice allowing the recipient to opt out of receiving future fax advertising. The fax ads sent in this case did not comply with these statutory requirements.

---

[1] Abraham testified that Marketing Research Center did not exist at all as a business entity but was just a name used on letterhead.

Prior to trial, the district court granted Paldo Sign's motion for partial summary judgment, finding as a matter of law that the fax sent was an "advertisement" as that term is defined by the Act, that the fax was sent to 10,145 fax numbers, and that it was sent without the recipients' consent. The only issue that remained for trial was whether Wagener and Wagener Equities were liable under the Act as the "senders" of the fax even though it was actually transmitted by Caroline Abraham doing business as B2B.

There were only two witnesses at trial. Paldo Sign presented the testimony of Caroline Abraham by having her deposition read to the jury and called Daniel Wagener to testify during the plaintiff's case-in-chief. Daniel Wagener also testified for the defense on behalf of himself and Wagener Equities. Documentary evidence included the faxes sent to Wagener, including sample ads, prices, and a "Welcome Aboard" letter with instructions on starting up the fax campaign. As we noted above, a jury concluded that Wagener and Wagener Equities were not liable for sending the faxes, and the court entered judgment for the defendants. Paldo Sign appeals.

## II.

On appeal, Paldo Sign challenges the jury instructions regarding sender liability and also contends that the district court abused its discretion in allowing testimony by Caroline Abraham that, prior to running B2B, she operated a diploma mill. We review *de novo* whether a challenged jury instruction fairly and accurately summarized the law, but the trial court's decision to give a particular instruction is reviewed for an abuse of discretion. *United States v. Lawrence,* 788 F.3d 234, 245

(7th Cir. 2015). We will reverse only if the instructions, taken as a whole, misled the jury. *United States v. Curtis*, 781 F.3d 904, 907 (7th Cir. 2015). We review the district court's evidentiary rulings for abuse of discretion. *Griffin v. Bell*, 694 F.3d 817, 826 (7th Cir. 2012); *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 475 (7th Cir. 2010).

## A.

The regulations implementing the Act specify that "[n]o person or entity may … [u]se a telephone facsimile machine, computer, or other device to send an unsolicited advertisement to a telephone facsimile machine, unless" certain conditions are met. 47 C.F.R. § 64.1200(a)(4). In turn, the regulations define the "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited adver-tisement." 47 C.F.R. § 64.1200(f)(10). After the district court granted partial summary judgment prior to trial, the only issue remaining for the jury was whether Daniel Wagener and Wagener Equities qualified as "senders" of the faxes when B2B was the entity that actually transmitted the faxes.

In instructing the jury on the meaning of "sender," the district court rejected a reading of the statute and regulations that imposed strict liability. The court instructed:

> In this case, Paldo Sign claims that Wagener Equities and Dan Wagener violated the Tele-phone Consumer Protection Act on or about November 9th, 2006, by authorizing a third-party sender, Business to Business Solutions, also known as B2B, to send a facsimile advertise-

ment on behalf of Wagener Equities to approximately 20,000 recipients, one of which was Paldo Sign. I will refer to the sending of that facsimile advertisement as the fax broadcast transmission.

As I told you at the outset of this trial, there are two issues that you must decide in this case. The first is whether defendant Wagener Equities authorized the fax broadcast transmission, and the second is whether defendant Dan Wagener had direct, personal participation in the authorization of the broadcast transmission.

As used in these instructions, the word "authorized" or the word "authorization," and you will see that authorization is in brackets, authorized means caused by words or conduct the fax broadcaster, B2B, to believe reasonably that Wagener Equities approved the sending of the fax broadcast transmission. It does not mean that Wagener Equities approved the recipients of the fax broadcast transmission.

Similarly, authorization means the causing of by words or conduct the fax broadcaster, B2B, to believe reasonably that Wagener Equities approved the sending of the fax broadcast transmission. It does not mean that Wagener Equities approved the recipients of the fax broadcast transmission.

R. 319 at 247-48.

Paldo Sign argues that the court should have confined the definition of "sender" to the language of the regulation. According to Paldo Sign, the court's instruction instead imported a common law vicarious liability standard through the use of the word "authorized," which required the jury to find something more than B2B sending the advertisements "on behalf of" Wagener and Wagener Equities. Paldo Sign also contends that the court's use of agency analysis conflicts with cases from other circuits.

After the appeal was briefed, we issued an opinion in a very similar case that also involved sender liability for a company that used the services of B2B for fax advertising. *See Bridgeview Health Care Ctr., Ltd. v. Clark*, 816 F.3d 935 (7th Cir. 2016). In *Clark*, we rejected a reading of the regulations that would impose strict liability on a company whose goods or services were advertised, recognizing that this would lead to absurd and unintended results. 816 F.3d at 938. For example, if a competitor of Wagener Equities sent out ten thousand unsolicited fax advertisements promoting Wagener's services, the resulting lawsuit could bankrupt Wagener even though Wagener played no part in sending the faxes. Although the literal language of the regulation suggests that such a result is possible, we noted that to be liable as a sender, a person must have done something to advertise goods or services. Citing 47 C.F.R. § 64.1200(f)(10), we ultimately held that "agency rules are properly applied to determine whether an action is done 'on behalf' of a principal." 816 F.3d at 938.

The instruction given by the district court required the plaintiffs to prove that Wagener and Wagener Equities "caused by words or conduct the fax broadcaster, B2B, to believe

reasonably that Wagener Equities approved the sending of the fax broadcast transmission." R. 319 at 247-48. That language is consistent with the agency analysis we applied in *Clark*. We noted in *Clark* that for the plaintiff to prove express, actual authority, the defendant "must have directly spoken or written to B2B, telling it to send … fax ads across multiple states." Paldo Sign's theory of the case[2] was that Wagener took all the steps listed in B2B's "Welcome Aboard" fax to initiate the advertising campaign, and that Wagener is therefore liable as a sender. Wagener defended by noting that the initial fax indicated that no advertisement would be sent without his final approval, that he had an agreement with Wilson to review the contact list and final ad before any faxes went out, and that the faxes were sent without an opportunity to review the contact list or to approve the final content and form of the ad. The jury apparently credited Wagener's testimony that he had told B2B not to send any ads without his final approval and an opportunity to review the contact list. As in *Clark*, "[b]ecause B2B expressly contradicted [defendant's] actual instructions, this is clearly not express actual agency." *Clark*, 816 F.3d at 939. Paldo Sign did not argue that the faxes were sent under Wagener's implied or apparent authority, and so the jury instructions given were a correct and complete statement of the law. Paldo Sign gives us no reason to doubt the holding of *Clark*. We conclude that the challenged jury

---

[2] Paldo Sign initially also pursued a strict liability theory, that Wagener was liable because Wagener Equities' goods and services were promoted in the faxes. Paldo Sign appears to have dropped that argument on appeal. In any case, we clearly rejected strict liability in *Clark*, and so we need not address that theory further.

instruction fairly and accurately summarized the law, and that the trial court did not abuse its discretion in giving this particular instruction. *Lawrence,* 788 F.3d at 245; *Curtis*, 781 F.3d at 907.

## B.

In seeking to prove its case, Paldo Sign relied on documentary evidence and the testimony of Abraham and Wagener. Abraham, whose testimony was presented by deposition, was the sole proprietor of the fax advertising business that she ran under the names B2B, Business to Business Solutions and Marketing Research Center. Paldo Sign called Wagener as an adverse witness in hopes of establishing that he was the person who caused the faxes to be disseminated, that he was the "sender" as that term is used in the statute and regulations. Needless to say, Abraham's testimony was key to Paldo Sign proving its case.

Abraham testified extensively about how she ran her fax advertising business with the assistance of a Romanian company, Macaw, and their independent contractor sales personnel, including Kevin Wilson. She explained the sales process and the regular business practices of the enterprise. Abraham drafted all of the business documents for the venture, including the sales materials that were transmitted to potential customers such as Wagener. At various points in her testimony, counsel asked Abraham whether she strove to be truthful and accurate in her business communications, and she consistently affirmed that she did. R. 318 at 67 ("I'm assuming you wanted to be truthful in your representations of the wording on those documents, correct?" "Yes."); R. 318 at 68

("And all of those documents that provided the process for those fax advertisement services were accurate and truthful, correct?" "Yes."); R. 318 at 70 ("Again, you wanted to be truthful and make accurate representations about the process in that [payment] letter, correct?" "Yes."). Abraham also testified that she sent out the payment letter to Wagener under Wilson's name and that she did not show the letter to Wilson first. The payment letter instructed the recipient on the steps to take to initiate the fax campaign. When asked whether there was any indication from Wilson that he agreed that the payment letter set forth the terms of his arrangement with Wagener, she replied, "Only the fact that I wrote it based on what he told me about. I wouldn't have written anything else." R. 318 at 99. Paldo Sign never called Wilson to testify. Aside from Wagener's testimony, the only information presented to the jury regarding agreements between Wilson and Wagener came from inferences that could be drawn from Abraham's testimony and from faxes sent to Wagener purportedly by Wilson (which were actually sent by Abraham). The plaintiff thus made Abraham's credibility the centerpiece of its case.

In questioning Abraham about her business background, counsel engaged in the following exchange with Abraham:

> Q. Did you have any involvement in something called university degree program?
>
> A. Yes. Years before that.
>
> Q. What was that business about?

A. That was a diploma mill selling diplomas to people based on work experience and life experience as opposed to classes.

Q. Were you the owner of that business entity?

A. No.

Q. Who was the owner of that business entity?

A. There were a number of different companies connected different ways. I don't remember being an actual owner, but I was in charge of a lot of it.

Q. Who was the owner? Do you know?

A. I don't know. I don't remember how it was set up. My husband and I, we were the people running the whole thing.

Q. You indicated you were the sole employee of or owner representative for that entity, correct?

A. Yes.

R. 318 at 63. The exchange occupied less than one page in testimony lasting fifty-eight pages.

Prior to trial, Paldo Sign moved to exclude Abraham's testimony that she had run a diploma mill, arguing that the testimony amounted to inadmissible character evidence of a prior bad act, that it was unrelated to the events at issue in the case, and that it was too remote in time to be relevant. On appeal, Paldo Sign adds that, although the testimony concerned a prior unrelated business, and did not suggest that the business was deceitful to its customers, the defendants used

the evidence to argue that Marketing Research and its employ-
ees were generally inclined to defraud clients. Paldo Sign
contends that the court should have excluded the evidence
under Federal Rules of Evidence 404(a), which generally
prohibits evidence of a person's character to prove that on a
particular occasion the person acted in accordance with that
character, and 608(b), which prohibits the use of extrinsic
evidence to prove specific instances of a witness's conduct in
order to attack the witness's character for truthfulness.

The district court did not abuse its discretion in admitting
the diploma mill evidence. The court ruled that the disputed
testimony was admissible

> because Abraham admitted that the business
> was a diploma mill which is a term that I don't
> find to be ambiguous as to its import. I think it
> clearly refers to an acknowledgment that the
> operation issued illegitimate diplomas. There
> was an argument, well, they weren't defrauding
> the customer, certainly, but I don't think that's
> the point. The point of a diploma mill is to issue
> diplomas that are going to be used to misrepre-
> sent the academic achievements of the people
> who are buying them. She was in a business, by
> her own admission, I think, that was facilitating
> that process. I do find that to be quite probative
> of her character for honesty. It's not remote in
> time.… It's limited. This is the only excerpt I am
> permitting on this subject, even though several
> others were proposed that also touched on this.
> And this will be brief. It does not require the

> introduction and I am not permitting the intro-
> duction of any further extrinsic evidence on the
> point.

R. 305-3 at 9-10.

In arguing for the inadmissibility of the diploma mill evidence, the plaintiff relies in part on Rule 404(a), but that rule contains an exception for evidence admitted under Rules 607 and 608. Rule 607 provides that any party may attack a witness's credibility. And Rule 608(a) provides in relevant part that a witness's credibility may be attacked by testimony about the witness's reputation for having a character for untruthfulness. The evidence admitted here comes squarely within those two rules. Abraham's testimony demonstrated a character for untruthfulness because she admitted running a business whose sole product was a deceitful document misrepresenting the credentials of the person presenting it.[3] She ran a business that, in essence, sold lies. That evidence was highly relevant to her character for untruthfulness, and her credibility was the key to Paldo Sign's case. Abraham emphasized in her testimony that she sought to be truthful in all of her business documents. She

---

[3] The Federal Trade Commission warns consumers that "there are some organizations that peddle bogus degrees. A 'diploma mill' is a company that offers 'degrees' for a flat fee in a short amount of time and requires little to no course work. Degrees awarded through diploma mills are not legitimate, and can cost you more than just your money." *See* https://www.consumer.ftc.gov/articles/0206-college-degree-scams (last visited May 25, 2016). The FTC goes on to warn that persons using "a so-called 'degree' from a diploma mill to apply for a job or promotion … risk not getting hired, getting fired, and possible prosecution."

testified that she wrote the payment letter according to the terms communicated to her by the sales person, Kevin Wilson, and that she would not have written it any other way. The payment letter purportedly instructed Wagener on how to commence the ad campaign, but the terms differed from those to which Wagener said he agreed.

The plaintiff's argument that the evidence somehow violated Rule 608(b) misses the mark. Rule 608(b) prohibits only the use of extrinsic evidence, not lines of questioning. *United States v. Dvorkin*, 799 F.3d 867, 883 (7th Cir. 2015). And the rule expressly affords the trial judge broad discretion to allow such questioning regarding prior instances of conduct if they are probative of the character for truthfulness or untruthfulness of the witness. Fed. R. Evid. 608(b); *United States v. Holt*, 486 F.3d 997, 1002 (7th Cir. 2007). As the district court noted, no extrinsic evidence was allowed to prove specific instances of misconduct. For example, there was no testimony by a customer who purchased a diploma from Abraham's business, or a company that was defrauded when it hired an employee on the basis of a fake diploma. The evidence was limited to Abraham's own admission that she ran a "diploma mill," a term that the district court acknowledged is not ambiguous. This evidence was not extrinsic and so Rule 608(b) does not bar it. *See also United States v. Abair*, 746 F.3d 260, 263-64 (7th Cir. 2014) (noting that Rule 608(b) bars extrinsic evidence of prior conduct to undermine a witness's credibility but gives trial judges discretion to allow counsel to ask questions about that conduct on cross-examination, subject to Rule 403). Nor did the court abuse its discretion under Rule 403, which provides that the "court may exclude relevant evidence if its probative value

is substantially outweighed by a danger of … unfair preju-dice." The court carefully limited the testimony to one brief instance of Abraham's prior conduct that the court found most probative of her character for untruthfulness, and concluded on balance that admission of this evidence was fair.

Paldo Sign also misses the mark in complaining that the diploma mill testimony was used to undermine Wilson's credibility. Wilson never testified and so his credibility was not at issue. In fact, it was Abraham who wrote the documents that were sent under Wilson's name. Wilson's only role was to engage in sale calls with Wagener, and Wagener was the only witness presented by Paldo Sign with personal knowledge of the content of those conversations. By relying so heavily on Abraham's testimony regarding the deal between B2B and Wagener, Paldo Sign placed Abraham's credibility, not Wilson's, at the center of the case. The court did not abuse its discretion in admitting her own limited testimony that she previously ran a diploma mill, an admission that fairly called her credibility into question.

AFFIRMED.