NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220536-U

NO. 4-22-0536

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| QUAD CITIES INDUSTRIAL MAINTENANCE & CONSTRUCTION, INC., | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | Rock Island County |
| v. | ) | No. 11L104 |
| GERI KRUCKENBERG, D.C., | ) | |
| Defendant-Appellee. | ) | Honorable |
| | ) | John L. McGehee, |
| | ) | Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court.
Presiding Justice DeArmond and Justice Knecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court affirmed the trial court's entry of summary judgment in favor of defendant.

¶ 2     In August 2011, plaintiff, Quad Cities Industrial Maintenance & Construction, Inc. (Quad Cities), filed a class action complaint against defendant, Geri Kruckenberg, D.C., alleging Kruckenberg violated the federal Telephone Consumer Protection Act (TCPA) (47 U.S.C. § 227 *et seq.* (2006)) by sending an unsolicited fax advertisement to Quad Cities and other similarly situated recipients. In June 2021, Kruckenberg filed a motion for summary judgment, arguing that because the company she hired to send the faxes, Business to Business Solutions (B2B), acted outside the scope of its authority, she was not liable for the violations. In May 2022, the trial court granted Kruckenberg's motion for summary judgment.

¶ 3     Quad Cities appeals, arguing the trial court erred by entering summary judgment in favor of Kruckenberg because the court improperly concluded B2B had made promises or

representations to Kruckenberg that it would send faxes only to persons who gave prior permission to receive them.

¶ 4        We disagree and affirm.

¶ 5                    I. BACKGROUND

¶ 6                    A. The Complaint

¶ 7        In August 2011, Quad Cities filed a two-count class action complaint against Kruckenberg based on an unsolicited fax advertisement that Quad Cities received in October 2005. Count I alleged that Kruckenberg violated the anti-junk-fax provisions of the TCPA by sending faxes to local businesses without their prior consent. Quad Cities sought statutory damages in the amount of $500 per violation. Count II stated a claim for conversion and sought recovery of the costs associated with receiving the unsolicited fax—for example, ink, paper, employee time, etc.

¶ 8        Quad Cities attached a copy of the unsolicited fax to its complaint. The fax advertised "Kruckenberg Chiropractic" and informed "Pain Sufferers" that Kruckenberg provided "Safe, Natural Treatment of the Cause of Your Pain Without Drugs, Needles, or Surgery." The fax listed Kruckenberg's address in Moline, Illinois, and included a coupon for a free, no-obligation consultation. The bottom of the fax contained a disclaimer, single-spaced and written in small font, which provided as follows:

"The above sponsor is not affiliated with, nor endorsed by, any charitable organization

Please Contribute to Reputable American Charities Dedicated to Helping Flood Victims

Advertising stimulates the economy. We will only send faxes to parties who wish to receive them. If you, or someone acting in [*sic*] your behalf, did not request or allow us, our agents, or our customers to send faxes to this number, this message was sent in error, and we apologize. If you do not want to receive charitable advertising or other faxes call *(718) 645-2018, Ext 233, twenty four-hours a day, seven days a week* or 8009919484, ext 399 to remove your number. (Lines are less busy evenings, nights, and weekends.) If you remove your number, we will never send another fax to this number. If you do not remove your number, it will certify that you give permission to continue to send faxes to this number. This message is the exclusive property of Macaw, SRL, 46 Match Factory St, Sec 5, Buc, Rom, 050183, 40723294564, which is solely responsible for its contents and destinations.

*'Remove' Hotline (718) 645-2018, Ext 233. 'Complaint' Hotline (718) 645-2021, Ext 232.*" (Emphases in original.)

¶ 9          B. Kruckenberg's Motion for Summary Judgment

¶ 10          In September 2011, Kruckenberg filed an answer to the complaint in which she denied the material allegations thereof. Subsequently, the parties engaged in several years of motions practice and discovery.

¶ 11          1. *The Motion for Summary Judgment*

¶ 12          In June 2021, Kruckenberg filed a motion for summary judgment, asserting that recent guidance from the Federal Communications Commission (FCC), which was authorized by Congress to pass and enforce regulations pertaining to the TCPA, demonstrated that the company Kruckenberg hired to send the fax, B2B, should be considered the "sender" of the fax (1) based

on fraudulent misrepresentations it made and (2) because it exceeded the scope of its authority by sending the fax ads to persons who had not consented to receive them.

¶ 13    Kruckenberg argued she was not the "sender" of the unsolicited faxes because B2B lied and misrepresented material facts to her in order to secure her business. Kruckenberg cited *Akin Gump*, 35 FCC Rcd. 10424, 2020 WL 5747205 (Sept. 21, 2020), an FCC decision holding that when "the fax broadcaster's deception or fraud leaves the advertiser unaware of and unable to prevent the unlawful faxes," the advertiser is not considered the "sender" of the fax and is not liable under the TCPA. Consistent with the FCC's ruling, Kruckenberg argued that because she had not authorized the identities of the recipients, she could not have prevented the violations and thus was not liable.

¶ 14    In support of her motion, Kruckenberg attached transcripts of depositions the sole proprietor of B2B had given in other TCPA cases. (We note that the attorneys for the parties in this case have been engaged in extensive TCPA litigation against each other for several years involving claims of violations by B2B on behalf of businesses across the country. Both parties submitted and relied on evidentiary materials from these other cases without any objection.) Those depositions showed that B2B (1) purchased a list of fax numbers from a third party, (2) never obtained prior consent to send faxes to those numbers, and (3) generally assured potential customers that (a) B2B had permission to send the faxes and (b) only people who had consented and wanted to receive faxes from the businesses being advertised would receive such faxes. B2B also told customers that sending fax advertisements was legal.

¶ 15    Kruckenberg also attached a copy of her own 2018 deposition, in which she asserted generally the following. In October 2005, Kruckenberg received an unsolicited fax from B2B offering advertising services. B2B stated it would design an ad for Kruckenberg at no cost

and, if she approved of the ad, B2B would fax that ad to people interested in her services. Kruckenberg contacted B2B and expressed an interest. B2B faxed Kruckenberg a form to complete in order to provide B2B with more information to design the advertisement. Kruckenberg completed the form and returned it to B2B. Kruckenberg stated she spoke on the phone with someone at B2B several times and discussed the costs of the services. Kruckenberg approved an ad and sent a check to B2B for $168.

¶ 16 Kruckenberg testified that she presumed that B2B would send her advertisement only to people who were interested in receiving it. She based this presumption on the disclaimer that B2B had added to the bottom of the ad, which stated, "We will only send faxes to parties who wish to receive them. If you, or someone acting in your behalf, did not request or allow us, our agents, or our customers to send faxes to this number, this message was sent in error." Kruckenberg acknowledged that she did not discuss with B2B whether the recipients of the ad campaign provided consent to receive such faxes; indeed, Kruckenberg stated that she was under the impression that sending unsolicited faxes was legal. However, she never felt the need to question B2B because she was relying on their expertise as a company that provided facsimile advertising services.

¶ 17 Kruckenberg never provided B2B with any fax numbers and did not know to whom B2B had sent the faxes. Kruckenberg testified in her depositions that, as far as she could recall, her discussions with B2B concerned (1) the cost of the service, (2) changes and edits to the advertisement, and (3) the geographic scope of the ad campaign. Kruckenberg stated she never saw the list of numbers, never knew the targets, never provided any numbers or targets, and did not personally send a single unsolicited fax.

¶ 18        Kruckenberg argued she was relying on B2B's (1) expertise in business advertising and (2) representations in the disclaimer that B2B promised to fax the ad only to those who had given permission. Kruckenberg argued that the disclaimer that B2B included in the ad constituted a promise that it would send Kruckenberg's ad only to people who had consented to receive it. Kruckenberg asserted that, because B2B (1) violated its promise and (2) engaged in fraud, B2B was not acting as Kruckenberg's agent when it sent out the October 2005 blast fax. To the contrary, Kruckenberg contended B2B intentionally misled her as part of a fraudulent scheme. Kruckenberg also argued that, per the FCC's ruling, B2B was the "sender" for liability purposes under the TCPA because B2B sent the fax on its own behalf and not on Kruckenberg's behalf, as required by the statute.

¶ 19                              2. *Quad Cities' Response*

¶ 20        In January 2022, Quad Cities filed a response in opposition to the motion for summary judgment. Quad Cities asserted that, at a minimum, a genuine issue of material fact existed regarding whether B2B was acting as Kruckenberg's agent when it sent the October 2005 fax. Quad Cities argued that the single sentence, in fine print at the bottom of the ad, did not constitute a contractual promise at all. Moreover, Quad Cities asserted, Kruckenberg could not have reasonably relied upon that disclaimer because (1) she thought sending unsolicited faxes was legal and (2) she knew that B2B had sent her an unsolicited fax with the same disclaimer despite her not giving prior permission.

¶ 21        Quad Cities also argued that the following undisputed facts showed that Kruckenberg hired B2B to send faxes advertising her chiropractic services and that B2B was acting within the scope of its actual or implied authority when it sent the blast fax in October 2005.

¶ 22      Kruckenberg received a fax from B2B proposing a fax advertisement campaign. Kruckenberg responded to the solicitation and provided information to B2B to help design the ad. Kruckenberg edited and ultimately approved the ad that B2B faxed. Kruckenberg paid $168 for the service. In all of Kruckenberg's communications with B2B, which consisted of up to 10 phone calls and several exchanged faxes, Kruckenberg never (1) asked about the proposed recipients, (2) gave any instructions to send faxes only to those who gave permission, or (3) received any information from B2B about (a) who would receive the faxes, (b) how they would be selected, or (c) whether they had given permission.

¶ 23      Quad Cities pointed out that Kruckenberg admitted she could have asked these questions but never did because (1) she did not know sending unsolicited faxes was illegal, (2) she assumed that B2B was a legitimate advertising business that complied with the law, and (3) she understood the disclaimer B2B placed on the bottom of the ad to mean that it sent faxes only to recipients who had given their prior permission.

¶ 24      Quad Cities argued that B2B never made any material representations or promises of any kind to Kruckenberg, and Kruckenberg never informed B2B, explicitly or implicitly, that B2B's authority to send faxes was limited to potential recipients who had given prior permission.

¶ 25      Kruckenberg was deposed a second time in December 2021 and stated in that deposition, "[T]here was no need to discuss it," regarding whether B2B had prior permission to send the faxes, and "[t]his was their business, so if it was illegal, you know, why would they be doing it?" Kruckenberg testified that she reviewed draft versions of the advertisement, made revisions, and approved the final version. B2B subsequently successfully transmitted the ad to 3191 fax numbers. Kruckenberg confirmed in her depositions that her communications with B2B were limited to (1) finalizing the draft ad, (2) specifying that the target audience would be within

the geographic area in Illinois and Iowa comprising what is colloquially known as the "Quad Cities"—that is, Rock Island, Moline, Davenport, and Bettendorf, (3) the amount and manner of payment, and (4) confirmation that the faxes were sent.

¶ 26    In its response to Kruckenberg's motion for summary judgment, Quad Cities also argued that Kruckenberg could not have relied on the fine print disclaimer because (1) the disclaimer was also on the first fax that B2B sent to Kruckenberg, which solicited her to purchase advertising services, and Kruckenberg admitted that she never gave B2B permission to solicit her by fax and (2) the disclaimer was too vague to be a promise because it said B2B would send faxes only to those who "wish to receive them," which was not at all similar to requiring permission.

¶ 27    Quad Cities urged the trial court to reject the FCC's ruling in *Akin Gump* because that ruling was premised on agency principles and therefore added nothing to the analysis of agency law in Illinois. Even if the court considered *Akin Gump*, Quad Cities asserted that a genuine issue of material fact existed regarding whether B2B's disclaimer and representations to Kruckenberg, if any, rose to the level of fraud and deception that left Kruckenberg "unaware and unable" to prevent TCPA violations.

¶ 28    3. *Kruckenberg's Reply*

¶ 29    In reply, Kruckenberg argued the undisputed facts showed that B2B was engaged in a fraudulent "blast fax" scheme in October 2005. B2B had admitted in other litigation that it purchased the fax numbers in 2004, never sought or obtained any permission to send advertisements to those numbers, and had received numerous complaints from (1) recipients of the faxes that B2B had sent, who explicitly told B2B they had not provided permission to B2B to fax them, and (2) B2B's customers, informing B2B that those customers were now being sued

for TCPA violations by recipients who never consented to receive any faxes. Kruckenberg pointed out that B2B's knowledge of illegality and its fraudulent fax scheme were so well known that federal circuit courts of appeals had discussed and described the same. See *Paldo Sign & Display Co. v. Wagener Equities*, *Inc.*, 825 F.3d 793, 800 (7th Cir. 2016).

¶ 30　　　　Kruckenberg also argued that Quad Cities was attempting to limit the discussion to whether Kruckenberg hired B2B to send the faxes, but Kruckenberg could be liable for the violations only if Quad Cities proved (1) the existence of an agency relationship and (2) that B2B acted within the scope of that relationship. Moreover, Kruckenberg contended that she had established that B2B had used false and deceptive means to acquire her business in the first place, which meant that B2B was solely liable for any violations.

¶ 31　　　　　　　　　　　C. The Trial Court's Order

¶ 32　　　　In May 2022, the trial court entered a written order granting Kruckenberg's motion for summary judgment.

¶ 33　　　　The trial court found the following:

> "[t]he disclaimer from B2B clearly provides to [Kruckenberg] that unsolicited faxes will be sent only to those who have invited or permitted those faxes to be sent. This is a contractual relationship and the scope of B2B['s] responsibility and duties is to only provide advertisements to those that 'wish to receive them.' "

¶ 34　　　　The trial court further explained its ruling as follows:

> "This court rules that the TCPA and FCC regulations do not impose strict liability on [Kruckenberg], but instead the court is to use a vicarious liability standard and review. This court employed an agency law analysis in determining

whether faxes were sent on behalf of [Kruckenberg] and within the scope of authority between [her] and fax broadcaster (B2B).

[Quad Cities] has failed to plead facts and provide proof to establish vicarious liability of [Kruckenberg] since B2B was operating outside the scope of employment and it had contractually agreed to only send to recipients that wished to receive the unsolicited faxes, and therefore the fax [Quad Cities] received was not sent 'on behalf' of [Kruckenberg]. This court has focused on the issues of control, agreement and express instructions that B2B's fax to [Quad Cities] was outside of [the] agency relationship and not transmitted on behalf of [Kruckenberg], and therefore [she was] not the sender of the faxes. B2B made an independent decision to blast fax entities or people that did not 'wish' to receive them as had been promised. The material facts relating to the relationship between B2B and [Kruckenberg], and the advertisement sent and the fax campaign are undisputed, and only one reasonable conclusion may be drawn from the undisputed facts, and that no liability attaches to [Kruckenberg] as a matter of law.

It was B2B that supplied all the fax numbers used to transmit the advertisement with the promise that they were only sending to those that had provided the required permission, and they controlled the entire process of sending 3191 faxes for $168, and thus [are] the most culpable in causing TCPA violations.

That the FCC has provided rules and regulations as provided in 18 FCC Rcd 14014(20) (2003) and in the matter of *Akin, Gump, Strauss, Hauer and Feld*

*LLP*, Petition for Expedited Clarification or Declaratory Ruling released September 21, 2020, clarifying that the fax broadcaster not the advertiser is the sole 'sender' of a fax for the purposes of the TCPA when it engages in conduct such as fraud or deception against an advertiser if such conduct leaves the advertiser unable to control the fax campaign or prevent TCPA violations. The use of the notice created by B2B was an attempt to confuse or deceive recipients as well as the advertiser that the unsolicited fax was for charitable contributions, thereby exempting the advertiser from liability."

¶ 35    This appeal followed.

¶ 36                            II. ANALYSIS

¶ 37    Quad Cities appeals, arguing the trial court erred by entering summary judgment in favor of Kruckenberg because the court improperly concluded that B2B had made promises or representations to Kruckenberg that it would send faxes only to persons who gave prior permission to receive them. We disagree and affirm.

¶ 38    As an initial matter, Quad Cities argues that the trial court erred by considering Kruckenberg's undated "declaration" (the document was titled "declaration" but was functionally an affidavit), which she had attached to her motion for summary judgment, because it was contradicted by her subsequent testimony at a second deposition, taken in December 2021. Kruckenberg responds that the court properly entered summary judgment in her favor based on the content of the fax disclaimer alone. Because we agree with Kruckenberg, we need not address the court's consideration of her declaration.

¶ 39                    A. The Applicable Law and Standard of Review

¶ 40                        1. *Motions for Summary Judgment*

- 11 -

¶ 41          Summary judgment is appropriate when "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). "A genuine issue of material fact precluding summary judgment exists where the material facts are disputed, or, if the material facts are undisputed, reasonable persons might draw different inferences from the undisputed facts." (Internal quotation marks omitted.) *Monson v. City of Danville*, 2018 IL 122486, ¶ 12, 115 N.E.3d 81. When examining whether a genuine issue of material fact exists, a court construes the evidence in the light most favorable to the nonmoving party and strictly against the moving party. *Beaman v. Freesmeyer*, 2019 IL 122654, ¶ 22, 131 N.E.3d 488.

¶ 42          "Summary judgment is a drastic means of disposing of litigation and 'should be allowed only when the right of the moving party is clear and free from doubt.' " *Id.* (quoting *Adams v. Northern Illinois Gas Co.*, 211 Ill. 2d 32, 43, 809 N.E.2d 1248, 1256 (2004)). Although a nonmoving party "is not required to prove his or her case, the nonmovant must present a factual basis arguably entitling that party to a judgment." *Horwitz v. Holabird & Root*, 212 Ill. 2d 1, 8, 816 N.E.2d 272, 276 (2004). A trial court's entry of summary judgment is reviewed *de novo*. *Monson*, 2018 IL 122486, ¶ 12.

¶ 43                              2. *The TCPA*

¶ 44          The TCPA prohibits the use of "any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement." 47 U.S.C. § 227(b)(1)(C) (2006). An "unsolicited advertisement" means "any material advertising the commercial availability or quality of any property, goods, or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." *Id.*

§ 227(a)(5). The FCC has codified the definition of the "sender" liable for a fax that violates the TCPA as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(11) (2005).

> "To prevail on a TCPA claim, plaintiff must show that (1) defendant used a fax machine, computer, or other device to send one or more faxes to plaintiff's fax machine; (2) the faxes contained material advertising the ' "commercial availability [or quality] of any property, goods, or services" '; and (3) plaintiff did not give prior permission or express invitation for defendant to send the fax. *Saf–T–Gard International, Inc. v. Wagener Equities, Inc.*, 251 F.R.D. 312, 314 (N.D. Ill. 2008). To satisfy the first element, the fax must have been sent by the defendant or on behalf of the defendant. *Palm Beach Golf Center—Boca, Inc. v. Sarris*, 781 F.3d 1245, 1254 (11th Cir. 2015). For the purposes of the TCPA, a 'sender' is defined as 'the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.' 47 C.F.R. § 64.1200(f)(10) (2012). 'In most instances, [the sender] will be the entity whose product or service is advertised or promoted in the message.' *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 21 FCC Rcd. 3787, 3808 (2006)." *Loncarevic & Associates, Inc. v. Stanley Foam Corp.*, 2017 IL App (1st) 150690, ¶ 28, 72 N.E.3d 798.

¶ 45                     3. *Vicarious Liability and Agency Principles*

¶ 46    Although the TCPA does not "explicitly assign vicarious liability," the Illinois Appellate Court and the FCC have concluded that the plain language of the TCPA and its legislative scheme demonstrates that Congress incorporated vicarious liability principles in the TCPA. *CE Design Ltd. V. C&T Pizza, Inc.*, 2020 IL App (1st) 181795, ¶¶ 43-44, 188 N.E.3d 318 (citing *Uesco Industries, Inc. v. Poolman of Wisconsin, Inc.*, 2013 IL App (1st) 112566, ¶¶ 54-55, 993 N.E.2d 97). "[W]hen determining whether a defendant is a 'sender' under the TCPA, where the sender did not transmit the fax, application of agency principles is proper in determining liability." *Loncarevic*, 2017 IL App (1st) 150690, ¶ 31.

> "The 'on behalf of' inquiry considers various factors including the degree of control exercised over the preparation of the faxes by the company advertising its services, whether that company approved the final content of the faxes as they were broadcast, and the nature and terms of the contractual relationship between the fax broadcaster and company advertising its services." *Id.* ¶ 32.

¶ 47                      B. This Case

¶ 48    Quad Cities argues that Kruckenberg could not rely on the statements at the in the disclaimer because (1) the wording was vague and did not constitute a promise, (2) any reliance would have been unreasonable given that Kruckenberg never gave consent to B2B to fax her, and (3) Kruckenberg never asked for confirmation or gave explicit instructions limiting B2B's authority. Quad Cities also contends that the evidence in support of the motion for summary judgment does not contain any suggestion that B2B made any representations to Kruckenberg that B2B would only fax consenting recipients. As such, Quad Cities asserts Kruckenberg made no showing of fraud or misrepresentation.

¶ 49        Quad Cities' arguments focus on the first sentence of the disclaimer. However, the disclaimer must be examined in context, not in isolation.

¶ 50        Reading the disclaimer as a whole, B2B was clearly (and intentionally) giving the false impression that it had the consent of the fax recipients. The sentence "[w]e will only send faxes to parties who wish to receive them" is followed by the statement "[i]f you, or someone acting in your behalf, did not request or allow us, our agents, or our customers to send faxes to this number, this message was sent in error." This use of "request or allow" is meant to clarify and further define "wish." Further, the disclaimer states that a failure to remove a fax number operates as "permission to continue to send faxes to this number," suggesting to unsophisticated consumers like Kruckenberg that people who "wished" to receive faxes could give their consent through silence, much like she did, thereby ratifying the fax. These statements, in combination, clearly conveyed to Kruckenberg that faxes would be sent only to people who have consented to receive them.

¶ 51        Quad Cities apparently argues that the fraud exception applies only when there is an express, explicit, unequivocal misrepresentation or promise. However, the law contains no such requirement or limitation, for good reason. Such a rule would encourage scammers to use vague language that leaves a clear impression, unmistakable to a reasonable person, but which results in immunity from liability. Consumer fraud law in general, and the TCPA in particular, are designed to *stop* abusive and harassing practices. More simply, Quad Cities' express statement requirement flies in the face of common sense. Parties to a contract need not make any express statements in order to enter into binding terms. For example, a person may hand a sweater to a dry cleaner and receive a ticket without saying a word. If the dry cleaner improperly cleans the sweater and ruins it, the dry cleaner is clearly liable.

¶ 52        As another example, in John Hughes' classic film Ferris Bueller's Day Off

(Paramount Pictures 1986), Bueller gives the car to the parking valets, who then joyride all over

the city. Bueller did not have to tell them they could not joyride all over the city—the scope of

their authority was understood when Bueller exchanged the keys for a valet ticket. The valets

exceeded that authority by driving the car for any purpose other than for parking.

¶ 53        In her depositions, Kruckenberg indicates she reasonably relied on B2B to act in a

manner consistent with federal law because fax advertising was their business specialty. Just like

our earlier examples, a reasonable person is entitled to rely on the implied promise that a

business will comply with the law and industry standards. This implied promise, combined with

the explicit and misleading disclaimer at the bottom of the fax, generated a reasonable

expectation that B2B would send faxes only to consenting recipients. Indeed, B2B was counting

on this impression to further its fraudulent scheme. By placing the disclaimer on Kruckenberg's

ad, B2B represented to Kruckenberg that it would act within a certain scope of authority.

¶ 54        Additionally, B2B completely controlled to whom the faxes were sent and used

its own list of numbers to select recipients. Quad Cities argues that Kruckenberg never asked

B2B about the numbers or recipients. But Quad Cities does not cite any authority suggesting

Kruckenberg had an obligation to do so. Indeed, the applicable/relevant authority holds to the

contrary. See *Akin Gump*, 35 FCC Rcd. 10424, 2020 WL 5747205 (Sept. 21, 2020). Moreover,

Quad Cities provides no evidence that Kruckenberg could have obtained the list of numbers or

selected the recipients of the fax. B2B's supplying the numbers and complete control over

choosing recipients supports the conclusion that B2B was the "sender" for liability purposes

under the TCPA. Accordingly, we conclude that the trial court properly entered summary

judgment in favor of Kruckenberg.

¶ 55                                    III. CONCLUSION

¶ 56          For the reasons stated, we affirm the trial court's judgment.

¶ 57          Affirmed.