*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 16-CV-1009

FDS RESTAURANT, INC., APPELLANT,

v.

ALL PLUMBING INC., SERVICE, PARTS INSTALLATION, ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-9575-11)

(Hon. Thomas J. Motley, Trial Judge)

(Argued October 17, 2018                    Decided March 26, 2020)

*Jonathan B. Piper*, with whom *Phillip A. Bock* and *Stephen H. Ring* were on the brief, for appellant.

*Molly A. Arranz*, with whom *Tamara B. Goorevitz* and *Michael L. Resis* were on the brief, for appellees.

Before BLACKBURNE-RIGSBY, *Chief Judge*, and GLICKMAN and FISHER, *Associate Judges*.

BLACKBURNE-RIGSBY, *Chief Judge*: This case requires us to construe the

so-called "junk fax" provisions of the Telephone Consumer Protection Act of 1991

("TCPA")[1] and its implementing regulation,[2] which restrict the sending of unsolicited advertisements via facsimile machine. In particular, we must decide whether a person or entity whose goods or services are advertised in an unsolicited fax ad qualifies as the "sender" of that ad and is therefore liable for violations of the TCPA – even if the fax was actually transmitted by a third party. We conclude that the statute and the regulation, read together and in the context of their purpose and history, do not impose strict liability on any person or entity whose good or service is advertised in a fax ad, but rather impose vicarious liability on a person or entity on whose behalf unsolicited fax ads were sent, regardless of who actually transmitted the faxes. In determining the standard for imposing vicarious liability, we discern no meaningful difference between the traditional agency law approach followed by some courts and the "on whose behalf" formulation followed by other courts; we therefore employ an agency law analysis in determining whether faxes were sent on behalf of a person or entity. Applying these principles to the case before us, we affirm the trial court's judgment for appellees based on its determination that the fax that appellant received in this case was not sent "on behalf of" appellees, and that appellees are therefore not liable for a violation of

---

[1] Pub. L. No. 102-243, 105 Stat. 2394 (1991) (codified at 47 U.S.C. § 227 (2018)).

[2] 47 C.F.R. § 64.1200 (2020).

the TCPA. We also affirm the trial court's denial of class certification based on its determination that the proposed class, represented by appellant, did not meet the requirements for a class action.

## I. Factual and Procedural Background

On December 2, 2011, appellant FDS Restaurant, Inc. ("FDS"), a District of Columbia corporation with its principal place of business in the District, filed suit against appellees All Plumbing Inc. Service, Parts, Installation, a Virginia corporation with its principal place of business in Arlington, Virginia, and All Plumbing's officer, director, and control person, Kabir Shafik (collectively "All Plumbing"). FDS alleged that All Plumbing, through Shafik, approved, authorized, and participated in sending to FDS an unsolicited fax advertisement for All Plumbing on or about September 23, 2006. FDS's complaint made class action allegations under Superior Court Rule of Civil Procedure 23, purporting to bring suit on behalf of all persons who received unsolicited fax ads advertising All Plumbing's goods or services on or after September 14, 2006.[3] FDS alleged that

---

[3] The TCPA does not contain its own statute of limitations, but, under 28 U.S.C. § 1658(a) (2018), there is a "catch-all" four-year statute of limitations for civil actions arising under an act of Congress enacted after 1990. *See Giovanniello v. Alm Media, LLC*, 726 F.3d 106, 109-110 (2d Cir. 2013). In this case, suit was

(…continued)

these faxes violated the TCPA and that, with FDS serving as class representative, the requirements for a class action seeking damages for these violations were met.

All Plumbing filed a motion to dismiss, which Judge Todd Edelman denied on February 29, 2012, and the parties began discovery. All Plumbing then filed motions for summary judgment; following a hearing before Judge Thomas Motley on January 7, 2015, the motions were denied by written order the same day. Judge Motley held that whether unsolicited fax ads were sent "on behalf of" All Plumbing, and whether Shafik directly participated in or authorized the sending of the fax ads, were material, factually disputed issues and therefore jury questions.

### A. Denial of Class Certification

---

(…continued)

brought in 2011 for a fax sent in 2006. FDS stated in its complaint that this suit was the second class action that had been brought against All Plumbing, and that the earlier suit, brought by a different plaintiff, tolled the statute of limitations for FDS and for the entire class it purported to represent. The earlier suit was brought by Love the Beer, Inc. and was filed on September 14, 2010. As the trial court later noted: "The *Love the Beer* case was originally pled as a class action suit, but after discovering that the defendant's [All Plumbing's] insurance carrier was considering denying insurance coverage due to improper notice of the *Love the Beer* suit, the class claims were dropped in favor of pursuing the instant case"; "[t]he *Love the Beer* matter was then dismissed in its entirety by stipulation on June 9, 2012." All Plumbing did not raise a statute of limitations defense in this case.

On March 1, 2012, FDS had filed an amended motion for class certification, and, on November 6, 2014, a second amended motion for class certification, the latter of which defined the class as: "All persons who between September 14, 2006 and September 30, 20[06] were sent telephone facsimile messages of material advertising the commercial availability of any property, goods, or services by or on behalf of [All Plumbing]." Following several written submissions from the parties and four days of hearings between January and June 15, 2015, on September 3, 2015, Judge Motley issued an order denying class certification.

In its lengthy and thorough order, the trial court summarized the evidence that had emerged from discovery – including a deposition of Shafik – which revealed that, in 2006, a company called Business to Business Solutions ("B2B") approached Shafik about advertising All Plumbing's services to other companies via fax.[4] Shafik provided written authorization to B2B to send 5,000 faxes to "all apartments, condo[]s [,] managements, [and] resta[u]rants" within thirty listed zip codes, all within Virginia, at a cost of $350. Shafik could not recall who submitted the payment from All Plumbing to B2B, but admitted that it may have been

---

[4] B2B was not named as a defendant by FDS in its original complaint or later named as a third-party defendant by All Plumbing.

another employee of All Plumbing. In any event, between September 22 and 28, 2006, for reasons that are unclear, B2B faxed ads for All Plumbing's business to 10,281 fax numbers located in Virginia, Maryland, and D.C., of which about 5,000 were in Virginia and about 5,000 were in D.C. FDS received one of these faxes at its place of business in D.C.

The trial court then discussed All Plumbing's proposed defense, which was that FDS would be unable to prove that the fax it received was sent "on behalf of" All Plumbing because FDS was located in D.C., and All Plumbing had only authorized faxes to be sent to Virginia fax numbers. After reviewing case law from other jurisdictions, the court stated:

> [T]his Court finds that FDS would have the burden to prove that the faxes sent by B2B were sent on behalf of All Plumbing – that is, within the scope of All Plumbing's authorization. All Plumbing's defense relating to the lack of authorization for the advertisement sent to FDS, the proposed class representative, therefore, has merit and will be a highly contested issue at trial. With practically no other issues in dispute, it is likely that a large portion of the litigation – perhaps all of the litigation – will be spent focused on this defense.

Based on this holding, the court proceeded to analyze whether FDS had met the requirements of commonality, typicality, and adequacy under Rule 23(a). It found that, because the question of whether a fax ad was sent "on behalf of" All

Plumbing was likely to generate different answers for different groups of proposed class members based on whether or not they were located in Virginia – and that, even for proposed class members located in Virginia, the answers would be different depending on whether or not they fell into the business types (e.g., restaurants) or particular zip codes identified by Shafik – FDS had failed to demonstrate sufficient commonality. Similarly, because FDS would be susceptible to All Plumbing's defense in a way that 5,000 Virginia fax recipients would not – and because, again, these Virginia class members would be differently situated from FDS and from each other based on whether they fell into the business types or particular zip codes identified by Shafik – FDS had failed to show that its claim was typical of putative class members. The court also found that, for the same reasons articulated above, FDS could not demonstrate that it was an adequate class representative.

The trial court then considered FDS's request to cure potential defects in its class definition by narrowing the definition to include only fax recipients located in D.C.[5] The court noted that this "D.C.-only class definition" had been presented to

---

[5] FDS also sought leave to secure an additional Virginia class representative. The trial court found that "the interest of comity weighs heavily against . . . concentrating the claims of a subclass comprised entirely of Virginia citizens and businesses in a single District of Columbia courtroom," particularly

(…continued)

the court "more than five months after the filing of the [second amended] motion [for class certification] and more than three years after the filing of the complaint," as it was contained in "FDS' *third* supplemental memorandum, and after three lengthy hearings on class certification." The court found that FDS had submitted an "eleventh-hour fallback position, after years of litigation and ample notice of its originally proposed class definition's deficiencies," and the court "exercise[d] its discretion to reject an attempt to remake a suit more than four years after it began" (citation and internal quotation marks omitted).[6]

## B. Trial

---

(…continued)

given that Virginia law does not allow class actions. The court additionally noted that FDS had not yet identified any potential Virginia claimants, despite the passage of years, and that Virginia would be a more convenient forum for litigation brought by Virginia persons and entities. The trial court therefore denied the request. FDS does not challenge this ruling on appeal.

[6] Finally, while noting that its findings under Rule 23(a) were sufficient to deny certification, the trial court proceeded to analyze the superiority of a class action under Rule 23(b)(3) as an additional basis for denying certification, as Rule 23 requires satisfaction of both subsections (a) and (b) for class certification, *see* Super. Ct. Civ. R. 23, and FDS had alleged in its complaint that Rule 23(b)(3) was satisfied. After reviewing the text and legislative history of the TCPA, the court concluded that, under Rule 23(b)(3)(A)-(D), a class action would not be superior to other methods of adjudicating the instant case.

The parties proceeded to trial on FDS's individual claim against All Plumbing, i.e., that it had received one unsolicited fax ad promoting All Plumbing's services. The court received written submissions from the parties and held pretrial hearings, in which the parties presented arguments regarding the issue on which the judge had earlier denied summary judgment: whether the fax ad that FDS received was sent (by B2B) "on behalf of" All Plumbing. Judge Motley then presided over a four-day bench trial in late August 2016, at which several people testified, including Shafik and All Plumbing employee Freddy Gonzalez. Several exhibits were admitted into evidence, including Shafik's original written request to B2B to send faxes, two copies of fax ads that were transmitted by B2B advertising All Plumbing's services, and the check from All Plumbing to B2B. As relevant here, the trial court found the following facts:

- In August 2006, a representative of B2B approached Shafik regarding advertising All Plumbing's business by fax.

- On September 19, Shafik provided written instructions to B2B (sent via fax) to send 5,000 faxes to fax numbers falling within thirty zip codes in northern Virginia – zip codes that he had obtained using a hard copy map of northern Virginia (where All Plumbing primarily did business) – at a cost of $350.

- Between September 19 and 21, B2B designed two fax ads for All Plumbing.

- On September 21, apparently in response to a call from someone at B2B, Gonzalez initialed the ads "OK" and returned them to B2B (via fax).

- The same day, Gonzalez also signed the name of the owner of All Plumbing to a check for $578 made out to B2B, faxing a copy of the check to B2B and also mailing the check to B2B.

- Gonzalez did not know why the price for the faxing was $578 or why it had increased from $350, and he was partially impeached with his July 2014 deposition testimony in which he testified that he would not have signed a check unless he were told to do so by Shafik.

- B2B then transmitted over 10,000 faxes advertising All Plumbing's services.

- On September 23, 2006 FDS received one of these fax ads at its D.C. fax number, which it did not consent to receiving.[7]

In determining what standard of liability to apply, the trial court stated that it rejected both an agency law approach and a strict liability theory, and would instead apply an "on behalf of" test, based on a formulation borrowed from case law from other jurisdictions. The court held that, because the evidence only established that All Plumbing authorized B2B to send faxes to Virginia, FDS had not met its burden to show that the fax it received at its D.C. number was sent "on behalf of" All Plumbing. The court then issued a brief written order and judgment finding in favor of All Plumbing on FDS's TCPA violation claim.

---

[7] No one from B2B testified or otherwise appeared in the case; the fact that the fax was received by FDS was established through the testimony of a computer forensics expert who examined a B2B hard drive, which had been obtained from B2B by an attorney who had previously worked on another case involving faxes sent by B2B.

FDS timely appealed, challenging both the denial of class certification and the court's post-trial merits ruling. On appeal, it argues that the trial court erred in not employing a strict liability standard to determine liability for unsolicited fax ads; that, even if the "on behalf of" test that the trial court used were the correct standard, the trial court misapplied it here; and that the trial court abused its discretion in denying class certification, including by failing to narrow the class definition to include only D.C. residents.

## II. Standard of Review

On appeal from a bench trial, we review the trial court's legal conclusions de novo and its factual findings for clear error. *See, e.g.*, *Ballard v. Dornic*, 140 A.3d 1147, 1150 (D.C. 2016); D.C. Code § 17-305(a) (2012 Repl.). We review a trial court's denial of class certification for abuse of discretion. *See, e.g.*, *Snowder v. District of Columbia*, 949 A.2d 590, 597 (D.C. 2008).

## III. Legal Framework

### A. The TCPA

Congress passed the TCPA in 1991 in order "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile ([f]ax) machines and automatic dialers." S. Rep. No. 102-178, at 1 (1991); *see also* H.R. Rep. No. 102-317, at 2, 5-7 (1991). In the face of increasing consumer complaints to the Federal Communications Commission ("FCC" or "Commission"), S. Rep. No. 102-178, at 1, and, concerned that "telemarketers, by operating interstate, were escaping state-law prohibitions on intrusive nuisance calls," *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 371 (2012), Congress enacted federal legislation designed to severely restrict phone and fax advertisements.

The statute prohibits certain types of autodialed or artificial or prerecorded voice calls, as well as certain types of fax advertisements, 47 U.S.C. § 227(b)(1)-(2), and it directs the FCC to promulgate implementing regulations, § 227(b)(2), (c) – which it did and which are codified, as relevant here, at 47 C.F.R. § 64.1200. The statute creates a private right of action that allows persons aggrieved by violations of these prohibitions to bring suit in state or federal court for injunctions

and damages.[8]  § 227(b)(3).  As to damages, plaintiffs may recover "actual monetary loss" or $500 – whichever is greater – for each violation of the TCPA and these damages may be trebled for willful or knowing violations.  § 227(b)(3).

The TCPA cases that have been brought in federal and state courts in the last three decades, as well as the FCC rulings that have been issued during this period, have addressed a great variety of issues arising under statute and the implementing regulation.  We are concerned here with the fax advertising provisions – specifically, those that were in force in September 2006, at the time the fax in question in this case was sent.

### 1. The "Sender" of a Junk Fax

The TCPA, as amended by the Junk Fax Prohibition Act of 2005, Pub. L. No. 109-21, 119 Stat. 359 (2005) (codified at 47 U.S.C. § 227), prohibits junk faxes, making it "unlawful for any person" to "use any telephone facsimile machine, computer, or other device to send" an unsolicited fax advertisement,

---

[8]  In 2012, the Supreme Court resolved a circuit split, holding that federal and state courts have concurrent jurisdiction over private suits arising under the TCPA. *Mims*, 565 U.S. at 372, 376.

unless the sender and the recipient have an established business relationship, the sender obtained the recipient's fax number through certain permissible means, the ad provides specific identifying information regarding the sender, and the ad contains a conspicuous opt-out notice that meets particular requirements. 47 U.S.C. § 227(b)(1)(C), (b)(2)(D)-(E), (d)(1)(2) (2006). The statute does not define the terms "send" or "sender."

The TCPA's implementing regulation largely tracks the statute, providing that "[n]o person or entity may" "send" an unsolicited fax advertisement unless the criteria described above are fulfilled. 47 C.F.R. § 64.1200(a)(3)(i)-(vi) (as amended Aug. 1, 2006) (now codified at 47 C.F.R. § 64.1200(a)(4)(i)-(vi)). It also provides that "a facsimile broadcaster will be liable for violations of paragraph (a)(3) of this section . . . if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions." § 64.1200(a)(3)(vii) (now codified at (a)(4)(vi)). The term "facsimile broadcaster" appears only in the regulation, not in the statute, and is defined as "a person or entity that transmits messages to telephone facsimile

machines on behalf of another person or entity for a fee." § 64.1200(f)(6) (now codified at (f)(7)).[9]

On August 1, 2006, the FCC amended the regulation to add a new term – "sender" – to the definitions section. The relevant language reads:

> The term *sender* for purposes of paragraph (a)(3) of this section means the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement.

47 C.F.R. § 64.1200(f)(8) (as amended Aug. 1, 2006) (now codified at (f)(10)).[10]

---

[9] The FCC's early TCPA-related rulings indicate the existence of some confusion regarding who qualifies as a fax broadcaster. *See, e.g.*, FCC, *Memorandum Opinion and Order: In re Rules and Regulations Implementing the TCPA*, 10 FCC Rcd. 12391, 12407-08 & n.88 (Aug. 7, 1995) ("*1995 Order*"); FCC, *Order on Further Reconsideration: In re Rules and Regulations Implementing the TCPA*, 12 FCC Rcd. 4609, 4610 & n.8, 4613 (Apr. 10, 1997). In 2003, the FCC added the definition of "facsimile broadcaster" and the "high degree of involvement provision," mentioned above, to the regulation in order to provide clarity on this question. FCC, *Report and Order: In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14130-32 (July 3, 2003).

[10] In its order promulgating these amendments to the regulations, the FCC provided the following explanation for its adoption of this new definition:

> The record reveals that fax broadcasters, which transmit other entities' advertisements to telephone facsimile machines for a fee, are responsible for a significant portion of the facsimile messages sent today. The

(…continued)

(…continued)

Commission sought comment . . . on whether to specify that *if the entity transmitting the facsimile advertisement is a third party agent or fax broadcaster*, that any do-not-fax request sent to that *agent* will extend to the underlying business on whose behalf the fax is transmitted.

. . .

*We conclude that the sender – the business on whose behalf the fax is transmitted – is responsible for complying with the opt-out notice requirements and for honoring opt-out requests.* Regardless of whether the sender includes its own contact information in the opt-out notice or the contact information of a third party retained to accept opt-out requests, the sender is liable for any violations of the rules. This determination is consistent with the Commission's telemarketing rules.

*We take this opportunity to emphasize that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent. In most instances, this will be the entity whose product or service is advertised or promoted in the message.* As discussed above, the sender is liable for violations of the facsimile advertising rules, including failure to honor opt-out requests. Accordingly, we adopt a definition of sender for purposes of the facsimile advertising rules.

*Under the current rules, a fax broadcaster also will be liable for an unsolicited fax if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile advertisements, and we will continue to apply this standard under our revised rules.* If the fax broadcaster supplies the fax numbers used to transmit the advertisement, for example, the fax broadcaster will be liable for any unsolicited advertisements faxed to

(…continued)

Thus, the new definition of sender that was added to the regulation is disjunctive: a "sender" is the person or entity "on whose behalf" a junk fax is sent "*or* whose goods or services are advertised or promoted" in the junk fax. *Id*. (emphasis added). Yet, the FCC's explanation of the 2006 amendments, found in its 2006 Order promulgating those amendments, refers only to the first half of the definition, "emphasiz[ing]" the FCC's "interpretation" that "the sender is the person or entity on whose behalf the advertisement is sent." *2006 Order*, 21 FCC Rcd. at 3808; see *supra* note 10. This statement in the *2006 Order*, and the first half of the definition of sender, are also consistent with the FCC's statement in its *1995 Order* that "the entity or entities on whose behalf facsimiles are transmitted

---

(…continued)

> consumers and businesses without their prior express invitation or permission. We find that a fax broadcaster that provides a source of fax numbers, makes representations about the legality of faxing to those numbers or advises a client about how to comply with the fax advertising rules, also demonstrates a high degree of involvement in the transmission of those facsimile advertisements.

FCC, *Report and Order: In re Rules and Regulations Implementing the TCPA & Junk Fax Prevention Act of 2005*, 21 FCC Rcd. 3787, 3807-08 (April 6, 2006) ("*2006 Order*") (emphasis added); *see also* FCC, *Final Rule: Rules and Regulations Implementing the TCPA & Junk Fax Prevention Act of 2005*, 71 Fed. Reg. 25967-01, 25971 (May 3, 2006) (summarizing the *2006 Order*).

are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *1995 Order*, 10 FCC Rcd. at 12407.  The purpose of the second half of the definition is, however, unexplained and unclear.

### 2.  *Existing Approaches to Liability for Junk Faxes*

With this statutory and regulatory backdrop in mind, we turn to the case law. We focus on the federal circuit decisions that have determined whether an entity is liable for unsolicited fax ads advertising its product or service that were sent by another party, usually a fax broadcaster.[11]  These circuit court decisions examine the definition of sender that was added to the regulation in 2006, and they address both strict liability and vicarious liability for violations of the TCPA's junk fax provisions.

#### i.  STRICT LIABILITY

The Seventh Circuit has consistently rejected a strict liability approach to violations of the TCPA's prohibition on junk faxes, "which would hold an entity

---

[11]    See *supra* III.A.1 and note 9 (discussing the definition of "fax broadcaster").

strictly liable if its goods or services were advertised in a fax regardless of its authorization of such advertisement." *Helping Hand Caregivers Ltd. v. Darden Restaurants, Inc.*, 900 F.3d 884, 888 (7th Cir. 2018) ("*Darden*"). In *Bridgeview Health Care Center, Ltd. v. Clark*, the court considered a defendant business's liability for fax ads sent by B2B in June 2006. 816 F.3d 935, 937 (7th Cir. 2016) ("*Clark*"). While the faxes were sent prior to the effective date of the August 1, 2006 amendments to the regulation, the court cited the definition of sender that was promulgated in those amendments – which included the language from the second half of the definition ("or whose goods or services are advertised or promoted in the unsolicited advertisement") – but the court then implicitly rejected this language by stating, without elaboration, that a "strict liability" theory of vicarious liability would lead to "absurd results." *Id.* at 938. Later that same year, in *Paldo Sign & Display Co. v. Wagener Equities, Inc.*, the court considered faxes sent by B2B in November 2006; the court noted the holding of *Clark*, which "rejected a reading of the regulations that would impose strict liability on a company whose goods or services were advertised, recognizing that this would lead to absurd and unintended results." 825 F.3d 793, 797 (7th Cir. 2016) ("*Wagener*"). While the *Wagener* court acknowledged the "literal language of the regulation" (the second half of the sender definition, quoted above) could be held to impose strict liability, it found "no reason to doubt the holding of *Clark*." *Id.* at

797-98.  Finally, the court revisited the question of strict liability in *Darden*, which involved a defendant that, in 2014, directly sent out unsolicited faxes using another company's logo, apparently in an attempt to boost the defendant's own business – despite the other company never agreeing to the use of its name or logo.  *Darden*, 900 F.3d at 885-87.  The *Darden* court again took note of the second half of the definition of sender in the post-2006 regulation, but reaffirmed its prior holdings.  It rejected a "strict liability approach," finding that it could lead to sabotage liability:  "a competitor could send out thousands of unsolicited [faxes] promoting another company's goods or services, thereby bankrupting that company, even though the company played no part in sending or authorizing the faxes."  *Darden*, 900 F.3d at 888; see *infra* note 15.  As discussed below, in each of these cases, the Seventh Circuit held that agency law is the correct rubric for determining liability for unsolicited fax ads, including those that are transmitted by a third party.

By contrast, the Sixth Circuit initially adopted a strict liability approach, but then later appeared to retreat from it.  In *Imhoff Investment, L.L.C. v. Alfoccino, Inc.*, a case in which B2B sent faxes in November and December 2006, the court quoted the regulation as amended on August 1, 2006, which included the new, more expansive definition of sender.  792 F.3d 627, 630, 634 (6th Cir. 2015).  In a somewhat puzzling passage, the court stated that "[t]he FCC's codification of this

definition of 'sender' is in accord with its earlier uncodified interpretation: 'the entity or entities on whose behalf facsimiles are transmitted are ultimately liable.'" *Id.* at 634 (quoting *1995 Order*, 10 FCC Rcd. at 12407-08) Thus, the *Imhoff* court did not recognize that the newly codified definition of sender expanded the FCC's earlier uncodified interpretation by adding the second clause ("or whose goods or services are advertised or promoted"). Nevertheless, the court proceeded to strictly construe the definition of sender, relying on the second half of the sender definition to hold that the defendant business was the "sender" of the faxes in question because it was "the party whose goods or services [were] advertised" – meaning it was liable for B2B's transmission of unsolicited fax ads, regardless of how the fax transmissions came about. *Id.* at 637.

Three years later, in *Health One Medical Center Eastpointe P.L.L.C. v. Mohawk, Inc.*, the court appeared to move away from a strict liability approach. 889 F.3d 800, 801 (6th Cir. 2018) ("*Mohawk*"). That case involved unsolicited faxes sent in 2016 by a pharmaceutical wholesaler, which advertised the products of certain drug manufacturers, and which were sent without the knowledge of those manufacturers. *Id.* The court was required to consider whether the companies whose products were advertised (the drug manufacturers) could be held liable, even though they were uninvolved and unaware of the wholesaler's transmission of

the fax ads. *Id.* The Sixth Circuit acknowledged the possibility of strictly construing the second half of the definition of sender in the 2006 amendment to the regulation to find that the manufacturers qualify as senders because they are entities "whose goods or services are advertised or promoted." *Id.* at 802. Reading the regulation in context with the statute and with the FCC's *2006 Order*, however, the court held that it was clear that the TCPA intends to allocate liability primarily to the entity on whose behalf a junk fax was sent – and to secondarily allocate joint liability to fax broadcasters only if these broadcasters were "knowingly" involved in sending junk faxes.[12] *Id.* The *Mohawk* court held that the drug manufacturers could not be liable as "senders" because they were not in any way involved in sending the faxes. *Id.* It summarily dismissed any suggestion that this holding was in tension with its prior holdings in *Imhoff*, discussed above, or in *Siding and Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, (6th Cir. 2016) ("*Alco*"), discussed below. The *Mohawk* court stated: "In both those cases [*Imhoff* and *Alco*,] the defendant in fact hired a fax broadcaster to send out the junk faxes. And thus in neither case did we hold, or have occasion to hold, that an innocent party –

---

[12] The statement regarding "knowing[]" involvement was presumably a reference to the "high degree of involvement" language in the regulation and discussed in the *2006 Order*, 21 FCC Rcd. at 3808, as the *Mohawk* court cited the summary of this discussion that appeared in the FCC's May 3, 2006 final rule (see *supra* note 10). *Mohawk*, 889 F.3d at 802 (citing 71 Fed. Reg. at 25971).

like [the drug manufacturers] here – could by some legal alchemy be held liable for having 'sent' the faxes." *Id.* (citations omitted). Thus, the Sixth Circuit appears to have joined the Seventh Circuit in recognizing that a strict liability approach is inappropriate for determining liability for fax transmissions that violate the TCPA.[13]

## ii. VICARIOUS LIABILITY

The Eleventh Circuit has found that a defendant business may be vicariously liable for unsolicited fax ads transmitted by a third party – though without specifying any particular standard for determining vicarious liability. In *Palm Beach Golf Center – Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, the court considered a fax transmitted by B2B in 2003; it therefore applied the pre-2006 regulatory language, which did not contain a definition of sender. 781 F.3d 1245, 1249, 1254 & n.9 (11th Cir. 2015) ("*Sarris*"). Seeking to clarify whether the defendant business qualified as a "sender" under the pre-2006 regulation, the court solicited a letter brief from the FCC, which averred that its pre-2006 treatment of

---

[13] Indeed, in *Darden*, the Seventh Circuit observed that, "after *Mohawk* it is clear that the Sixth Circuit interpretation of the statute is not inconsistent with our caselaw recognizing that a defendant who has no connection whatsoever to the sending of the fax cannot be held liable under the TCPA." 900 F.3d at 889.

fax advertisements was set forth in its *1995 Order* – which, as noted above, stated that the entity "on whose behalf" faxes are sent is "ultimately liable" for TCPA violations. *Id.* at 1254-55. The *Sarris* court held that, given the statutory ambiguity as to the definition of "send" or "sender" and the reasonableness of the FCC's interpretation, that interpretation was entitled to deference. *Id.* at 1255-57. It concluded that, "[b]y construing the sender as the party 'on whose behalf facsimiles are transmitted,' the FCC has placed liability at the source of the offending behavior that Congress intended to curtail." *Id.* at 1257 (quoting *1995 Order*, 10 FCC Rcd. at 12407). The *Sarris* court then reversed the district court's grant of summary judgment, finding that, on the facts of that case, the question of whether the unsolicited fax was sent "on behalf of" the defendant must be submitted to a jury. *Id.* at 1257-58.

Relying on the Eleventh Circuit's decision in *Sarris*, the Middle District of Florida issued a decision in *Cin-Q Automobiles, Inc. v. Buccaneers Ltd. Partnership*, No. 8:13-cv-01592-AEP, 2014 WL 72224943 (M.D. Fla. Dec. 17, 2014), which, though unpublished, has been cited by several other courts.[14] The

---

[14] The Eleventh Circuit initially issued *Sarris* on October 30, 2014. *Palm Beach Golf Center – Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 771 F.3d 1274 (11th Cir. 2014). On March 9, 2015, the court, sua sponte, vacated and superseded that opinion with an opinion that was nearly identical – the most notable change

(…continued)

*Cin-Q* court rejected both a strict liability approach and an agency law approach. *Id.* at *5-7.[15] It "conclude[d] that 'on whose behalf' is a standard lying somewhere in the middle – more forgiving than a blanket application of *per se* liability but somewhat more stringent than vicarious liability through common law agency." *Id.* at *7. Finally, citing the *Sarris* court's analysis of the facts before it, which led it to remand, the *Cin-Q* court extrapolated and elaborated factors to be considered in determining whether a third party sent a fax "on behalf of" another person or entity. *Id.*

The Seventh Circuit, for its part, has consistently employed an agency law approach to determining vicarious liability. As discussed, in *Clark*, the Seventh

---

(…continued)
being that three paragraphs of the analysis of standing were removed (a change that is not relevant here). *Sarris*, 781 F.3d at 1250-53. In December of 2014, after *Sarris* first came down but before the Eleventh Circuit vacated and reissued the opinion, the Middle District of Florida issued its *Cin-Q* decision, which relied on the portions of *Sarris* relevant here.

[15] In *Cin-Q*, because the faxes were sent in 2009, the court invoked the definition of "sender" contained in the post-2006 regulatory language. 2014 WL 7224943, at *5. But it rejected the second half of the definition, finding that strictly construing a "sender" as a person or entity "whose goods are services are advertised" would not only be inconsistent with the FCC's own *2006 Order*, see *supra* note 10, but would lead to "absurd results" – including "sabotage liability," in which a business could expose a competitor to damages by blasting out junk faxes advertising its competitor's products, without the competitor's agreement or even awareness. *Id.* at *6.

Circuit rejected the notion that the second half of the definition of "sender" contained in the regulation could give rise to strict liability. *Clark*, 816 F.3d at 938. Instead, the court focused on the first half of the sender definition and held, without elaboration, that "agency rules are properly applied to determine" whether faxes were sent "on behalf of" an entity. *Id.* Similarly, in *Wagener*, the court rejected strict liability, holding that, "to be liable as a sender, a person must have done something to advertise goods or services," *Wagener*, 825 F.3d at 797 and it reaffirmed that "'agency rules are properly applied to determine whether an action is done "on behalf" of a principal.'" *Id.* (quoting *Clark*, 816 F.3d at 938). Finally, in *Darden*, the Seventh Circuit reaffirmed its prior holdings in *Clark* and *Wagener* that "agency rules should be applied." *Darden*, 900 F.3d at 888.

The Sixth Circuit, building upon the Eleventh Circuit's decision in *Sarris* and the Middle District of Florida's unpublished decision in *Cin-Q*, has adopted a vicarious liability approach that it has termed "on whose behalf" liability. In *Alco*, the court considered faxes that were sent by B2B in 2005 and 2006, before the 2006 regulatory amendments took effect; after engaging in a lengthy retroactivity analysis, the court concluded that the pre-August 1, 2006 regulatory language was

applicable. 822 F.3d at 889, 891-96, 898.[16] Rejecting the agency law approach adopted by the Seventh Circuit in *Clark* because it was "unsupported by any analysis," *id.* at 897, the *Alco* court held that the FCC's "on whose behalf" language from its *1995 Order* controls, and it relied on *Sarris* and *Cin-Q* to define the contours of the "on whose behalf" standard. *Id.* at 897-99. Echoing *Cin-Q*, the *Alco* court stated that "the 'on-whose-behalf' standard thus exists as a middle ground between strict liability and vicarious liability," *id.* at 898, and labeled "on-whose-behalf" a "term of art that blends (1) federal common-law agency principles . . . and (2) policy considerations designed to address which entity was most culpable." *Id.* at 899.[17] While the Eleventh Circuit did not announce a specific standard or test in *Sarris*, the Sixth Circuit drew upon the analysis in *Sarris* to define the "on whose behalf" standard as follows:

> To decide whether one entity . . . broadcast a potentially unauthorized fax "on behalf of" another entity . . ., courts have considered a variety of factors. These factors include the degree of control that the latter entity

---

[16] *Alco*, decided the year after *Imhoff*, found *Imhoff*'s strict liability approach "easily distinguishable" because "[i]n *Imhoff*, the defendant's faxes were transmitted after the August 1, 2006 date on which" the 2006 amendments to the regulation – which added the definition of sender – "became effective." *Alco*, 822 F.3d at 895.

[17] *See also Compressor Eng'g Corp. v. Mfrs. Fin. Corp.*, 746 Fed. App'x 460, 463-64 (6th Cir. 2018) (adopting and applying the *Alco* court's approach).

exercised over the preparation of the faxes, whether the latter entity approved the final content of the faxes as broadcast, and the nature and terms of the contractual relationship between the fax broadcaster and the latter entity.

*Alco*, 822 F.3d at 898-99 (citing *Sarris*, 781 F.3d at 1258).[18]

To summarize, the Eleventh Circuit has not explicitly endorsed or rejected any particular theory of vicarious liability for junk faxes, the Seventh Circuit has asserted that traditional agency law principles furnish the proper inquiry, and the Sixth Circuit has adopted a formulation that it calls the "on whose behalf"

---

[18] The *Alco* court also quoted this language from *Cin-Q*:

Circumstances to be considered include, but are not limited to, the degree of input and control over the content of the fax(es), the actual content of the fax(es), contractual or expressly stated limitations and scope of control between the parties, privity of the parties involved, approval of the final draft of the fax(es) and its transmission(s), method and structure of payment, overall awareness of the circumstances (including access to and control over facsimile lists and transmission information), and the existence of measures taken to ensure compliance and/or to cure non-compliance with the TCPA.

*Alco*, 822 F.3d at 899 (quoting *Cin-Q*, 2014 WL 7224943, at *7).

standard, which it characterizes as more exacting than a common-law agency analysis but less severe than strict liability.[19]

### 3. *This Court's Approach to Liability for Junk Faxes*

#### i. REJECTING STRICT LIABILITY

As an initial matter, we join the Sixth and Seventh Circuits in rejecting a strict liability approach to construing the definition of sender. *See Darden*, 900 F.3d at 885-87; *Mohawk*, 889 F.3d at 802. This rejection of strict liability applies to faxes that were sent at any time, including those (like the fax at issue in this case) that were sent after August 1, 2006.

---

[19] The Third Circuit has taken note of, but not ruled on, this specific question, as it was not presented in the case before the court. *See City Select Auto Sales Inc. v. David Randall Assocs.*, 885 F.3d 154, 160-61 (3d Cir. 2018). The only state high court decision we have found that directly addresses this issue appears to be consistent with the Seventh Circuit's interpretation: in *Ex parte Lary*, which involved fax ads sent in 2002, the Alabama Supreme Court found that, because the plaintiff had alleged that the unsolicited fax ads it received were sent by the defendant business or "on its behalf," this sufficed to state a claim for a TCPA violation because actions authorized pursuant to the TCPA "implicitly include the doctrine of vicarious liability, whereby employers are liable for the acts of their agents and employees." 951 So. 2d 635, 637 (Ala. 2006) (citation and internal quotation marks omitted).

As discussed, see *supra* III.A.1, the August 1, 2006 amendments to the regulation defined "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(8) (as amended Aug. 1, 2006) (now codified at (f)(10)). However, imputing liability based on the second half of this disjunctive definition – referring to the person or entity "whose goods or services are advertised or promoted" – makes little sense in light of the statute and regulation's prohibition on the "use" of a fax machine (or other device) to "send" unsolicited fax ads, 47 U.S.C. § 227(b)(1)(C); 47 C.F.R. § 64.1200(a)(3) (as amended Aug. 1, 2006) (now codified at (a)(4)), as the second half of the sender definition requires no use of a fax machine and refers only to the actual content of the fax ad. *See Mohawk*, 889 F.3d at 802.

Moreover, the second half of the sender definition cannot be squared with the language of the FCC's own order promulgating these amendments, in which it referred to "the sender" as "the business on whose behalf the fax is transmitted" and further "emphasize[d] that under the Commission's interpretation of the facsimile advertising rules, the sender is the person or entity on whose behalf the advertisement is sent," which, "[i]n most instances . . . will be the entity whose product or service is advertised or promoted in the message." *2006 Order*, 21 FCC

Rcd. at 3807-08. Indeed, the Commission's statement that the "sender" will, "*in most instances*," "be the entity whose product or service is advertised," appears to confirm that, at least in some instances, the entity whose product or service is advertised is *not* the sender – because the fax was not sent on behalf of that entity. It would therefore be inappropriate to automatically or universally impose liability on an entity simply because its product or service was advertised in a fax.

Nor can the second half of the sender definition be reconciled with the FCC's pre-August 1, 2006 interpretation of sender as "the entity or entities on whose behalf facsimiles are transmitted," and who "are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *1995 Order*, 10 FCC Rcd. at 12407. Similarly, the letter brief submitted by the FCC in *Sarris* asserted that "the definition of sender promulgated in 2006 is consistent with the Commission's pre-existing uncodified interpretation" – from the *1995 Order* – "that the entity or entities on whose behalf facsimiles are transmitted are ultimately liable for compliance with the rule banning unsolicited facsimile advertisements." *Alco*, 822 F.3d at 894 (quoting FCC Letter Brief, 2014 WL 3962595, *4 (July 17, 2014) (internal quotation marks omitted)). While a letter brief submitted by the FCC in a pending case does not have the force of a regulation or an order, this statement suggests that, in interpreting and applying the

regulation, the FCC was ignoring the second half of the definition of sender. Indeed, in *Alco*, the Sixth Circuit declined to accord deference to the FCC's 2014 letter brief because only by ignoring the second half of the definition of sender could the FCC assert that that definition was consistent with the *1995 Order. Id.* at 894-95.[20]

Most importantly, we find nothing in the TCPA or its legislative history – or crucially, in the FCC record – that indicates an intent to create a strict liability regime for the sending of unsolicited fax ads. To the contrary, other language in the regulation suggests that a party must play an active part in transmitting unsolicited fax ads to be properly construed as a "sender," and the FCC record indicates that the Commission was attempting to avoid rigidity and to promote a

---

[20] Reading the statute and the regulation together with the *1995 Order*, the *2006 Order*, the 2006 amendment to the regulation that added the definition of sender, and the 2014 letter brief, one might speculate that the FCC intended to make the definition of sender conjunctive rather than disjunctive, i.e., to require both conditions to be satisfied. In other words, a sender would be "the person or entity on whose behalf a facsimile unsolicited advertisement is sent *and* whose goods or services are advertised or promoted in the unsolicited advertisement." One might speculate that perhaps a drafting error led to the use of the word "or" instead of "and." This may explain the Eleventh Circuit's (perhaps inadvertent) statement that "a person whose services are advertised in an unsolicited fax transmission, *and* on whose behalf the fax is transmitted, may be held liable directly under the TCPA's ban on the sending of junk faxes." *Sarris*, 781 F.3d at 1254 (emphasis added).

nuanced, fact-based approach to apportioning responsibility for TCPA compliance – and liability for TCPA violations – between businesses and the fax broadcasters they hire. *See 2006 Order*, 21 FCC Rcd. at 3807-08. Further, we agree with the courts, including the Sixth and Seventh Circuits, that have concluded that a strict liability regime would allow for absurd results, including sabotage liability, in which companies could impose crippling penalties on their competitors by sending unsolicited faxes advertising their competitors' products and services – all without the competitors' consent or even knowledge.[21] It would be bizarre indeed if Congress or the FCC intended to create such a state of affairs.[22]

---

[21] *Cf. Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 915-916 (7th Cir. 2011) (observing that "draconian penalties for multiple faxes," combined with the potential for class actions, can "impose[] potentially very heavy penalties on its violators").

[22] FDS's arguments notwithstanding, the Hobbs Act, 28 U.S.C. § 2342(1) (2018), is not relevant here. The Hobbs Act confers exclusive jurisdiction on federal courts of appeals to enjoin, suspend, or determine the validity of certain final orders of the FCC. *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S.Ct 2051, 2055 (2019). As the Supreme Court has recently noted, it is unclear whether the FCC's *2006 Order* is subject to the Hobbs Act. *Id.* at 2055-56. In any event, neither the trial court nor this court seek to invalidate or suspend the *2006 Order*. To the contrary, we seek to read the relevant regulation consistently with itself and with the *2006 Order* – as well as with the *1995 Order* and, to the extent it may be probative, with the FCC's 2014 letter brief in *Sarris*.

We therefore reject a strict liability approach that would hold a person or entity vicariously liable for unsolicited fax ads transmitted by third parties (fax broadcasters or otherwise) simply because that person or entity's products or services were advertised in the faxes. Rather, we find that, in order for a person or entity to be subject to vicarious liability as the sender of a junk fax, the fax must have been sent on behalf of that person or entity. For the reasons discussed below, we join the Seventh Circuit in holding that an agency law analysis is the appropriate vehicle for determining "on whose behalf" an unsolicited fax advertisement was sent.

ii. UTILIZING AGENCY LAW TO DETERMINE VICARIOUS LIABILITY

Agency law is, in essence, a means of determining whether one party acted on behalf of another party. *See, e.g.*, *United States v. Weitzel*, 246 U.S. 533, 542 (1918) ("[T]he term 'agent' is ordinarily used as implying appointment by a principal *on whose behalf* he acts.") (emphasis added); *Davey v. King*, 595 A.2d 999, 1002 (D.C. 1991) ("The hallmark of an agency relationship is that the agent takes action *on behalf of* the principal and subjects himself to the orders of the principal.") (emphasis added); *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982) ("Generally an agency relationship results when one person authorizes another to

act *on his behalf* subject to his control, and the other consents to do so.") (emphasis added).

Indeed, the *Restatement of Agency*, upon which this court has often relied to clarify principles of agency law,[23] begins with the premise that "[a]gency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act *on the principal's behalf* and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." *Restatement (Third) of Agency* § 1.01 (Am. Law Inst. 2006) (emphasis added). The comment to this section goes on to specify:

> The concept of agency posits a consensual relationship in which one person, to one degree or another or respect or another, acts as a representative of or otherwise acts *on behalf of* another person with power to affect the legal rights and duties of the other person. The person represented has a right to control the actions of the agent. Agency thus entails inward-looking consequences, operative as between the agent and the principal, as well as outward-looking consequences, operative as among the agent, the principal, and third parties with whom the agent interacts.

---

[23] *See, e.g.*, *Jenkins v. Strauss*, 931 A.2d 1026, 1032 (D.C. 2007); *Rose v. Silver*, 394 A.2d 1368, 1371 (D.C. 1978); *Ezersky v. Survis*, 43 A.2d 294, 295 (D.C. 1945).

*Id.* § 1.01 cmt. c (emphasis added). An agency relationship, as described above, may be created through actual authority (either express or implied), apparent authority, or ratification. *Id.* §§ 2.01–4.08. As to the "outward-looking consequences" resulting from the agent's interactions with third parties, "[a]n employer is subject to liability for torts committed by employees while acting within the scope of their employment" – with employee being defined as "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work." *Id.* § 2.04, 7.07; *see also* Respondeat Superior, *Black's Law Dictionary* (11th ed. 2019) ("The doctrine holding an employer or principal liable for the employee's or agent's wrongful acts committed within the scope of the employment or agency."). These principles clearly bear on the situation we examine here, i.e., vicarious liability *vel non* for a business as a result of the actions of a fax broadcaster it has hired.

As discussed, the Sixth Circuit in *Alco* asserted that an agency law analysis was inappropriate for assessing vicarious liability and that it was more appropriate to employ a novel "on whose behalf" standard, which it found involves the consideration of several factors, including "the degree of control that the latter entity exercised over the preparation of the faxes, whether the latter entity approved the final content of the faxes as broadcast, and the nature and terms of

the contractual relationship between the fax broadcaster and the latter entity." *Alco*, 822 F.3d at 898. Yet, these factors are no different than those that would be considered in an agency law analysis.

As alluded to above, the determination of whether an agent was acting on behalf of a principal requires a fact-bound inquiry that involves consideration of several factors, including the degree of control the principal exercises over the agent, the statements and actions of the principal vis-à-vis the agent, and the existence and scope of a contract or agreement between the principal and the agent. *See, e.g.*, *Restatement (Third) of Agency* §§ 1.01, 1.01 cmts. b-c & e, 2.02, 2.02 cmts. c-e, 2.03 cmt. c, 2.04 cmt. b, 7.07, 7.07 cmts. b-c; *see also id.* § 1.02 ("Whether a relationship is characterized as agency in an agreement between parties or in the context of industry or popular usage is not controlling."); *id.* § 1.02 cmt. a ("Whether a relationship is one of agency is a legal conclusion made after an assessment of the facts of the relationship and the application of the law of agency to those facts."). As we have previously stated:

> Whether an agency relationship exists in a given situation depends on the particular facts of each case. The factors to be considered include (1) the selection and engagement of the servant, (2) the payment of wages, (3) the power to discharge, (4) the power to control the servant's conduct, (5) and whether the work is part of the regular business of the employer. Of these factors, the

> determinative one is usually whether the employer has the right to control and direct the servant in the performance of his work and the manner in which the work is to be done. The cases emphasize that the right to control, rather than its actual exercise, is usually dispositive of whether there is an agency relationship. In deciding this question, courts will look both to the terms of any contract that may exist and to the actual course of dealings between the parties.

*Judah v. Reiner*, 744 A.2d 1037, 1040 (D.C. 2000) (citations and internal quotation marks omitted); *see also Slater v. Berlin*, 94 A.2d 38, 42 (D.C. 1953) (the existence of an agency relationship "is usually a question of fact"). Moreover, an agency relationship can exist for limited purposes and periods, *see, e.g.*, *Restatement (Third) of Agency* § 3.09; *W. W. Chambers, Inc. v. Audette*, 385 A.2d 10, 14 (D.C. 1978), meaning that these factors can be considered to determine whether an agent was acting on behalf of a principal during a particular occurrence or transaction – such as the transmission of unsolicited fax ads. In short, agency principles provide flexible standards for assessing the nature of the relationship between the parties in order to determine the legal consequences of actions taken by the agent. *See, e.g.*, *Moseley v. Second New St. Paul Baptist Church*, 534 A.2d 346, 348 (D.C. 1987); *Penn Cent. Transp. Co. v. Reddick,* 398 A.2d 27, 30-32 (D.C. 1979); *Johnson v. M.J. Uline Co.*, 40 A.2d 260, 262-63 (D.C. 1944).

Accordingly, agency principles are suitable for addressing the Sixth Circuit's concern that the vicarious liability analysis employed in the junk fax context should reflect "policy considerations designed to address which entity was most culpable in causing a TCPA violation" and "target[] the entity primarily responsible for such conduct." *Alco*, 822 F.3d at 899. A vicarious liability analysis utilizing agency principles would, by its very nature, "place[] liability at the source of the offending behavior that Congress intended to curtail." *Id.* (quoting *Sarris*, 781 F.3d at 1257).[24]

---

[24] Indeed, there is some indication that Congress itself intended agency principles to inform a vicarious liability analysis under the TCPA, as another provision of Title 47 of the U.S. Code – which has not been amended since 1934 and is entitled "Agents' acts and omissions; liability of carrier" – provides:

> In construing and enforcing the provisions of this chapter, the act, omission, or failure of any officer, *agent*, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

47 U.S.C. § 217 (2006 & 2018) (emphasis added). This provision and the TCPA, which is codified at 47 U.S.C. § 227, appear within the same chapter (Chapter 5) and the same subchapter (Subchapter II) of Title 47. An action under the TCPA is therefore an "action construing and enforcing the provisions of this chapter" under 47 U.S.C. § 217, which, by its own terms, creates vicarious liability for the acts of an agent. While the federal circuit court decisions interpreting the junk fax provisions of the TCPA do not mention this provision, at least one state court decision has relied on it to find that an agency analysis is appropriate for assessing

(…continued)

This conclusion is consistent with the proposition that "[f]ederal statutory tort actions, such as those authorized under the TCPA, typically are construed to incorporate federal common law agency principles of vicarious liability where, as here, the language of the statute permits such a construction and doing so would advance statutory purposes." *In re DISH Network, LLC, et al.*, 28 FCC Rcd. 6574, 6584 (May 9, 2013); *see, e.g., Staub v. Proctor Hosp.*, 562 U.S. 411, 418-422 (2011) (noting that "general principles of . . . agency law . . . form the background against which federal tort laws are enacted" and applying agency principles, as articulated in the *Restatement*, to determine vicarious liability for violations of the Uniformed Services Employment and Reemployment Rights Act); *Meyer v. Holley*, 537 U.S. 280, 285-91 (2003) (applying agency principles, as articulated in the *Restatement*, to determine vicarious liability for violations of the Fair Housing Act); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754-66 (1998) (applying agency principles, as articulated in the *Restatement*, to determine vicarious liability for violations of Title VII of the Civil Rights of 1964); *Am. Soc. of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 565-575 (1982) (applying agency

---

(…continued)
vicarious liability for violations of the TCPA's prohibition on junk faxes. *Uesco Indus., Inc. v. Poolman of Wis., Inc.*, 993 N.E.2d 97, 110-11 (Ill. App. 2013).

principles, as articulated in the *Restatement*, to determine vicarious liability for violations of the Sherman Act).[25]

In sum, we discern no meaningful difference between a traditional agency law analysis and the so-called "on whose behalf" standard, and we find that principles of agency law are adequate to fulfill the purpose and intent of the TCPA. We therefore apply agency law in determining whether a person or entity is

---

[25] The FCC's *DISH Network* ruling concerned the telemarketing provisions of the TCPA. Relevant federal circuit court decisions and the FCC's 2014 letter brief filed in *Sarris* have rejected the *DISH Network* analysis as inapplicable to the junk fax provisions of the TCPA. *Alco*, 822 F.3d at 896-97; *Clark*, 816 F.3d at 938; *Imhoff*, 792 F.3d at 635; *Sarris*, 781 F.3d at 1254-55. Yet, it is not readily apparent why there are not instructive parallels between the TCPA's telemarketing provisions, which use the term "initiate" with respect to a phone call, 47 U.S.C. § 227(b)(1)(B), and the TCPA's fax provisions, which use the term "send" with respect to a fax, 47 U.S.C. § 227(b)(1)(C). (This is especially so given that another part of the TCPA, the "Technical and procedural standards" subsection, also uses the term "initiate" with respect to a fax. 47 U.S.C. § 227(d)). To the contrary, *DISH Network*'s analysis of vicarious "on behalf of" liability appears to be quite relevant to the junk fax context, particularly the FCC's statement that the "concepts" that define the term "on behalf of" "easily can be read to encompass common law agency principles." *DISH Network*, 28 FCC Rcd. at 6585. In any event, the FCC's general statement in *DISH Network* – that agency law principles of vicarious liability are typically applied in the context of federal statutory tort actions – stands, as demonstrated by the Supreme Court decisions cited above.

vicariously liable for the actions of a third party, such as a fax broadcaster, that

sends unsolicited fax ads on its behalf.[26]

## B. Class Certification

A plaintiff must meet the requirements of Super. Ct. Civ. R. 23(a) to obtain

class certification. *Ford v. ChartOne, Inc.*, 908 A.2d 72, 86 (D.C. 2006). Rule

---

[26] This approach accords with our holding in *Portuguese American Leadership Council of the U.S., Inc. v. Investors' Alert, Inc.*, 956 A.2d 671 (D.C. 2008), the only case in which this court considered, albeit indirectly, the issue of vicarious liability for unsolicited fax advertisements sent before 2006. We reversed the trial court's grant of summary judgment, holding that the allegations in the complaint were sufficient to warrant further discovery and create a jury question as to whether a fax broadcaster was more than a "mere conduit" for unsolicited fax ads. *Id.* at 680-81. We observed that, under the regulation, a fax broadcaster will be liable for violations of the junk fax prohibition if it has "a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions," meaning that a fact-intensive analysis of the situation was required to determine and apportion liability for both the company advertising its goods or services and the fax broadcaster that it hires to send the faxes. *Id.* 680-82 & n.11 (quoting 47 C.F.R. § 64.1200(a)(3)(vii) (now codified at (a)(4)(vi)) and discussing the FCC's *2006 Order*).

Similarly, in a prior unpublished decision, the District of Columbia Superior Court found that businesses could be liable under the TCPA for unsolicited fax ads sent in 2001 because a fax broadcaster sent the faxes "on behalf of" the businesses. *Covington & Burling v. Int'l Marketing Research, Inc.*, No. Civ.A. 01-0004360, 2003 WL 21384825 (D.C. Super. Ct. Apr. 17, 2003). The court held that, even if the businesses were not "the actual sender[s] of the unsolicited faxes," they could not avoid liability simply by using "an agent" to send faxes advertising their goods. *Id.* at *1, 7-8 (citation and internal quotation marks omitted).

23(a) requires the plaintiff to demonstrate the existence of four factors: (1) numerosity, that the class is so numerous that joinder of all its members is impracticable, (2) commonality, that there are questions of law or fact common to the class, (3) typicality, that the named plaintiff's claims or defense are typical of the class; and (4) adequacy, that the named plaintiff is an adequate representative of the class. *Id.*; *Snowder*, 949 A.2d at 596; *Yarmolinsky v. Perpetual Am. Fed. Savs. & Loan Assoc.*, 451 A.2d 92, 94 (D.C. 1982).

With respect to commonality, not every issue of law or fact must be the same for every class member, but if the evidence required to prove a defendant's liability varies from class member to class member, then the question is not common to all class members. *Ford*, 908 A.2d at 85-86. Typicality seeks to ensure that the named class representative will act on behalf of the class; while factual variations between the claims of the representative and those of other class members will not negate typicality, *id.* at 86, the representative's claims are not typical where it is predictable that a major focus of the litigation will be on an arguable defense unique to the representative and the representative will be distracted by that defense. *Yarmolinsky*, 451 A.2d at 95. Adequacy has to do with whether the named plaintiff will fairly and adequately protect the interests of the entire class. *Ford*, 908 A.2d at 86. The Supreme Court has explained, with respect

to the federal counterpart to our Rule 23, that the commonality, typicality, and adequacy requirements tend to merge, although adequacy additionally raises concerns about the competency and potential conflicts of class counsel. *Ford*, 908 A.2d at 85 (citing *General Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 158 n.13 (1982)).

"The party seeking certification has the burden of showing that the request for class certification complies with the requirements of the rule. Whether that burden has been met is a matter entrusted to the trial court's discretion, and its decision will not be reversed unless that discretion has been abused." *Cowan v. Youssef*, 687 A.2d 594, 602 (D.C. 1996). "Indeed, when the trial court conducts a thorough review of the request for class certification, . . . we will not reverse its decision even if we would have ruled differently." *Id.*

## IV. Analysis

We reject a strict liability approach and apply an agency law approach to determining whether a junk fax was sent "on behalf of" a person or entity. Accordingly, we conclude that the trial court did not err in holding that the fax to FDS was not sent on behalf of All Plumbing. The trial court stated that it would

not employ an agency law analysis in assessing vicarious liability, but would instead employ a modified version of an "on behalf of" test based on the factors articulated in *Alco* and *Cin-Q*, as discussed above. It considered FDS's control over the faxes, the content of the faxes, contractual or expressly stated limitations between FDS and B2B, privity between FDS and B2B, FDS and B2B's overall awareness of the circumstances, and any measures taken to ensure compliance with the TCPA. The test that the trial court applied, in our view, amounts to an agency analysis. *Cf. Clark*, 816 F.3d at 938 ("While the [trial] court appeared hesitant to label this an agency theory," "[w]e recognize this for what it is: an agency analysis.").

In determining whether one party (the agent) was acting on behalf of another party (the principal), a court looks not to the parties' labeling of their relationship, but to the facts of the relationship, *Restatement (Third) of Agency* § 1.02, § 1.02 cmt. c, and it examines several relevant factors, including control, contracts or agreements, and the words and actions of the principal. *Id.* §§ 1.01, 1.01 cmts. b-c & e, 2.02, 2.02 cmts. c-e, 2.03 cmt. c, 2.04, 2.04 cmt. b, 7.07, 7.07 cmts. b-c. That is exactly what the trial court did here; how it denominated its analysis is immaterial. The court examined the evidence and found – based on witness testimony, its own witness credibility determinations, and the documents presented

– that there was "hard, stubborn evidence" that Shafik had expressly limited to Virginia the faxes that B2B was to send, meaning that B2B's transmission of a fax to FDS in D.C. was outside of the authorization of All Plumbing. In other words, the court conducted a fact-intensive inquiry focused on the issues of control, agreement, and express instructions to conclude that B2B's fax to FDS was outside of the agency relationship and not transmitted on behalf of All Plumbing. The court concluded, based on this analysis, that All Plumbing was not the "sender" of that fax. *Cf. Clark*, 816 F.3d at 939 ("In short, B2B made an independent decision to blast faxes across multiple state lines. On this record, the trial court did not err in concluding that [the defendant] was not liable for faxes sent outside the . . . radius on which he expressly instructed B2B."); *Uesco Indus., Inc.*, 993 N.E.2d at 114 ("B2B exceeded the scope of its authority when it sent fax advertisements to persons or companies other than those" specified by the defendant business; thus, "liability cannot be imputed to defendant for any fax advertisements received by those outside the authorized scope."). In light of the principles outlined above, we discern no error in this ruling.

As to FDS's contention that the court could infer that All Plumbing authorized the faxes to D.C. because Shafik expressly agreed (in writing) to pay B2B $350 for 5,000 faxes sent inside Virginia, while B2B was ultimately paid

$578 (via a check issued by Gonzalez) and B2B ultimately transmitted over 10,000 faxes to Virginia, D.C., and Maryland, the trial court found that there was simply no evidence of what occurred to cause the increase in amount or number of faxes – meaning that FDS had not met its burden to show that the faxes to D.C. were transmitted on behalf of All Plumbing. Again, we discern no error in this ruling, particularly given that a plaintiff in a civil suit generally has the burden of proving its case by a preponderance of the evidence and that this burden cannot be carried by speculation. *See, e.g., Myrick v. Nat'l Sav. & Tr. Co.*, 268 A.2d 526, 527 (D.C. 1970).[27]

Similarly, we find no abuse of discretion in the trial court's denial of class certification. The trial court found that All Plumbing was likely to raise a defense that the fax to FDS was not sent on its behalf because it only authorized B2B to transmit faxes to Virginia, not to D.C. This finding proved to be correct, as All Plumbing did raise – and ultimately prevailed on – this defense at trial (following

---

[27] For the same reasons, we see no reason to disturb the trial court's rejection of FDS's additional "creative" argument that the trial court could infer that All Plumbing authorized B2B to send faxes to D.C. based on the fact that B2B faxed two ads, one of which included a small cartoon illustration stating that All Plumbing is "the best plumbing service in Virginia" and one of which did not, as there was nothing in the record to indicate – and the court would therefore have had to speculate to conclude – that the ad without the cartoon was intended for D.C. recipients and approved by All Plumbing.

the denial of class certification). Because FDS had proposed a class definition that included both Virginia and D.C. (and Maryland) fax recipients, and proposed itself as a class representative, the court concluded that All Plumbing's defense would render FDS's claim uncommon and atypical, and render FDS an inadequate class representative, vis-à-vis the 5,000 Virginia recipients – who formed roughly half the putative class. The trial court further noted that the claims of Virginia recipients may also differ from one another depending on whether they were the types of business or located in the zip codes that Shafik had authorized. This is the kind of situation that would "require in-depth factual determinations about different individuals to determine whether [a TCPA violation occurred] in a given case," which defeats commonality. *Snowder*, 949 A.2d at 598. It is also the kind of situation in which the class representative, FDS, would be distracted by a personal defense that would be "a major focus of the litigation" – as noted, this defense was the basis of the trial court's merits judgment – which defeats typicality. *Yarmolinksy*, 451 A.2d at 95.[28] And, given the absence of commonality

---

[28] FDS notes that "the bulk of trial was devoted to whether the faxes at issue were in fact successfully transmitted to FDS and the class members." It may be true that significant time was spent on this issue (largely because FDS itself had no record of the fax ad and had to rely on electronic evidence – introduced and explained via lay and expert witness testimony – to prove that FDS had actually received a fax ad in 2006). See *supra* note 7. But the dispositive issue at trial, as FDS itself acknowledges, was whether the fax ad that FDS received was sent "on behalf of" All Plumbing.

and typicality, FDS could not adequately represent the other class members. In short, the trial court made a reasoned decision that was based on the evidence, considered all relevant factors, and applied the correct legal principles. *See, e.g.*, *Johnson v. United States*, 398 A.2d 354, 362-65 (D.C. 1979). There is no indication that the trial court improperly exercised its discretion in denying class certification.

As to FDS's contention that the trial court should have allowed it to amend its class definition to include only D.C. fax recipients, the trial court was simply not required to do so. As noted, the trial court considered the record and found this proposal to be "an eleventh-hour fallback position" submitted "more than five months after the filing of the [second amended] motion [for class certification] and more than three years after the filing of the complaint"; it also took note of the fact that FDS had not attempted to amend its complaint, but instead made this request in its "*third* supplemental memorandum, and after three lengthy hearings on class certification." The court therefore "exercise[d] its discretion to reject an attempt to remake a suit . . . after years of litigation and ample notice of [FDS's] originally proposed class definition's deficiencies" (citation and internal quotation marks omitted). It is clear that the court fully considered the facts and circumstances in considering "a matter entrusted to the trial court's discretion," that is, whether the

party seeking certification met its burden. *Cowan*, 687 A.2d at 602. "[W]hen the trial court conducts a thorough review of the request for class certification, as it did here, we will not reverse its decision." *Id.*

## V. Conclusion

For the reasons discussed, we conclude that the trial court did not err in ruling in favor of All Plumbing based on its finding that B2B did not send the unsolicited fax ad to FDS on behalf of All Plumbing, and we further conclude that the trial court did not abuse its discretion in denying class certification based on its finding that the requirements for a class action under Rule 23 were not met. The judgment of the trial court is therefore

*Affirmed.*